Crawford, Auditor, vs. Carson, Ex., et al.

## CRAWFORD, Auditor, vs. CARSON, Ex., et al.

1. COLLECTOR OF REVENUE: *Liability of his sureties.*
The sureties on a collector's bond are not bound by the ascertainment by the auditor upon his own *ex parte* investigation, of the collector's indebtedness for moneys received by him for liquor licenses.

2. SUITS AGAINST THE STATE: *Injunction against.*
*Sec.* —— *Gantt's Digest* does not prohibit chancery courts from enjoining individuals assuming to act in behalf of the state and as state officers, from acts not authorized by law, and which are productive of irreparable mischief.

3. VENUE: *Local jurisdiction.*
The circuit court of the county in which lands are wrongfully levied on under a distress warrant illegally issued by the auditor of the state, has jurisdiction of a suit to enjoin the sale.

4. MANDAMUS: *Use of writ.*
The writ of mandamus is a writ to compel the performance of an act or duty, and not to prevent it; and our Code does not intend that it shall take the place of an injunction.

5. COLLECTOR OF REVENUE: *For what liquor licenses liable.*
A collector of revenue is liable, and his sureties with him, for all moneys collected by him on liquor licenses issued up to the end of his term of office, although they do not expire until the end of the calendar year; and each set of sureties, in several successive terms, is liable for his collections during the particular term for which they are sureties.

6. DISTRESS WARRANT: *When auditor may issue.*
The auditor can issue a distress warrant against a collector and his sureties for the amount due the state for liquor licenses collected by him, only upon the certificate of the county clerk showing the amount found by his settlement with the county clerk to be due. In the absence of

such settlement and certificate, or if they be fraudulently obtained, the auditor can not himself ascertain the amount due and issue a warrant of distress to collect it. If the county court fail to enforce a settlement, it may be coerced to do so by a superior court. If the settlement be fraudulent, the auditor may, and should, have it corrected by proceedings in equity.

7. DEMURRER: *Mistake of remedy: Mandamus: Injunction.*

  It is no ground of demurrer that the plaintiff mistakes his remedy in adopting proceedings by mandamus to effect the purpose of an injunction. But in such case the court should, of its own motion, dismiss the petition, unless it be reformed and transferred to the equity docket.

APPEAL from *Jefferson* Circuit Court.

Hon. J. A. WILLIAMS, Circuit Judge.

*Attorney General,* for appellant.

*McCain, contra.*

EAKIN, J. James F. Vaughan had been duly elected sheriff and *ex-officio* collector of Jefferson county.

On the twenty-eighth day of November, 1874, he, together with Samuel Carson, now deceased, and the other appellees, as his sureties, executed a bond to the state of Arkansas in the sum of $370,000, conditioned to be void "if the said James F. Vaughan shall faithfully perform the duties of collector of the revenue for the county aforesaid, for the year 1874, and shall well and truly pay over all moneys collected by him by virtue of his office, according to law." Preceding this condition is a recital of the due election of said Vaughan, and his commission as sheriff, and that he was, by virtue thereof, *ex-officio* collector of the revenue within and for said county, for the time prescribed by law. It was further provided "that in case the said James F. Vaughan, as collector as aforesaid, shall fail

or refuse to pay into the state treasury the amount which shall or may be found due from him as such collector, to the state, it shall and may be lawful for the auditor of state, within fifteen days after the time the said collector is required by law to make his annual settlement with the state, to issue a warrant of distress against said collector and his securities, as is now provided by the act regulating the assessment and collection of the revenue of the state of Arkansas, approved April 23, 1873."

The act referred to (*sec.* 79) made the sheriff of each county "*ex-officio* collector of all taxes assessed on the tax-book of his county," and required him, before entering upon his duties as collector of taxes, to give a bond, conditioned, " for the faithful performance of the duties of his office, and for well and truly paying over all moneys collected by him by virtue of his office." (*Sec. 80.*) Provision was made for the appointment of some other person as collector, in case the sheriff should fail to give the bond (*sec. 81*), and he was prohibited, under a severe penalty, from collecting any taxes not stated on the tax-book, or in excess of those stated, except as authorized by the act. (*Sec. 83* ) His *term* of office was to expire "on the last day of the month in which they are required to make their final settlement for the last tax-book, which is to be collected by them and receipted for during their term of office as sheriff." *Sec. 84.*

County taxes were imposed, and licenses required by the act, upon certain occupations and exhibitions; and taxes, both for the county and the state, of $100 each, were imposed on retail liquor licenses—that for the state to be paid in United States money, for the benefit of the sinking fund. (*Sec. 159.*) The clerk was directed to issue, from time to time, blank licenses to the collector, charging

him with the amount, which the collector was, on pay-
ment of the tax, to fill ‾up and deliver. (*Sec. 159* ) It
was made the duty of the county court (then board of su-
pervisors) to cause the collector, at each regular term of
the court, to settle his account of all blank licenses, cred-
iting him with those returned ; to ascertain the amounts
due the state and county, respectively, and to enter the
settlements of record. If he failed to settle, he might be
attached until he did ; and *immediately after* each settlement
with the county court, it was made the duty of the clerk
to certify to the auditor the amount due the state, which
amount the collector was required to pay into the state
treasury within fifteen days thereafter. *Secs. 160, 161.*

Provisions were made by which collections by the sheriff
of fines, penalties and forfeitures, and, by clerks, of taxes
on writs, etc., and other sums coming into their hands,
were to be paid over to the collector. *Secs. 162 to 169.*

By a previous section of the act (*sec. 110*) it had been
made the duty of the collector, immediately after his set-
tlement with the clerk of the court, of the charges against
him in the tax-books, and before the fifteenth day of June
in each year, to pay over all moneys found due at such set-
tlements to the persons entitled thereto. After the forego-
ing provisions with regard to licenses and other collections
not included in the tax-books, it was provided (by *sec. 171*)
that if the collector should "fail to pay the amount due
into the treasury, and produce the treasurer's receipt, to
the auditor, therefor, within fifteen days after the settle-
ment required in sec. 110," he should forfeit his commis-
sions and 25 per cent. on the amount, and also interest on
the amount wrongfully withheld, at 5 per cent. per month
from the time it should have been paid, to actual payment.
The auditor was directed to charge the delinquent accord-

ingly, and authorized to collect the amount of principal and forfeitures, as follows:

Immediately after the time specified in *section 168*, in each year, the auditor was required to issue a distress warrant against the delinquent and his sureties, to the coroner, or a constable of the county in which they might reside, and which was to be executed by the officer by levy upon and sale of the lands and goods.

The section (*168*) to which reference is made, specifies no time for anything, but provides that when money shall be received by the collector from any other officer, such as sheriff or clerk, he shall receipt for the same, stating how much is for the state and how much is for the county, and the particular fund to which it belongs.

Such are the prominent features of the act under which this bond was given, and by which the liability of the obligors, and the powers and duties of the auditor are to be controlled.

On the thirty-first day of July, 1877, appellant, as auditor, issued a distress warrant to the coroner, or any constable of Jefferson county, against Vaughan and his sureties in the bond, reciting that upon an adjustment of said Vaughan's account as collector for Jefferson county in the state of Arkansas, there was found to be due from him to the state " for revenues collected, or which ought to have been collected by him for the year 1875, the sum of *fifty-three hundred and sixty-six dollars and eighty-five cents,*" including amount of commissions forfeited, " and 25 per cent. on the amount due and unpaid at the time fixed by law for the full amount and payment" thereof; " and a part of the above-named sum, to-wit, the sum of *forty-two hundred and ninety-three dollars and forty-eight cents,* bears interest according to law at the rate of 5 per cent. per

month, from the first day of July, 1875, until paid." The writ then proceeds to command a levy and sale of the effects of the defendants therein, to pay said sums, etc. It came to the hands of Anthony Johnson, a constable, on the sixth of August, 1877, who levied it upon a large amount of real property, advertised the sale to take place at the court-house door in Pine Bluff, on the eighth of September following.

Whereupon the sureties of Vaughan presented a petition to the judge of the circuit court of Jefferson county, reciting their execution of the bond, and alleging that said Vaughan did, in fact, make his annual settlement in June, 1875, with the auditor, as required by law, for all state taxes and revenue collected in the year 1874, and obtained from the auditor vouchers, which they exhibit, of full payment and settlement of all general revenue, sinking fund, common school fund, and interest on the ten-year bond fund for the year 1874. They claim that they are not bound in any manner whatever for the revenue of 1875, and as to liquor license, only bound for so much thereof as the collector may have received during the period between the twenty-eighth of November and the last of December of that year; that the liquor license tax was to be collected for the calendar year, and in that time Vaughan had not collected any. They insist further that if there had been any delinquency for which they were amenable to a distress warrant, it should have issued immediately upon the failure of the collector to make his annual settlement and pay the amount due into the treasury; and that the auditor had no right to issue the same after two years. They say that the county clerk never complied with the revenue law (*sec. 108 of act of 1873*) in certifying to the auditor any balances due to the state from the collector other than those

Crawford, Auditor, vs. Carson, Ex., et al.

for which he had received his quietus as aforesaid. It is further objected that the bond is not in accordance with the statute. They complain that they have relied upon the quietus given to the collector, and that the distress warrant was issued against them without notice and an opportunity of being heard, and without anything before the auditor of an authoritative character, based upon doc-uments, returns and records, but, that, on the contrary, all the records in the auditor's office showed conclusively that the collector had accounted for and paid off all the taxes and revenue for the year 1874, and that the quietus of the collector should be conclusive, unless changed by a direct judicial proceeding to correct an error or mistake.

They deny that the collector failed or refused to pay over any moneys collected by him for the year 1874, but that he did offer to pay the then auditor all the liquor license tax collected by him up to the date of his settlement, and that the auditor declined to receive the same, because said liquor license tax was not charged against the collector upon the records of the auditor's office.

They say that on the fifteenth of December, 1874, there were placed in the said collector's hands blank liquor licenses to the amount of $9,500, and previous thereto, to-wit, in November, $10,400 worth, all of which latter licenses had been returned to the clerk's office, and he had been credited with the same ; and that not one of the former lot of $9,500 had been disposed of by him between the execution of the bond and the last of December, 1874, but that thirty-eight of them were disposed of between the first of January, 1875, and the fifteenth of June, and the balance afterwards, except those returned, and they deny their responsibility for those disposed of in 1875.

They say the collector was amply solvent in June, 1875,

but has since become a bankrupt, and is now insolvent. They moved for a writ of mandamus and for a temporary order in vacation, preventing the constable from proceeding with the sales; and that the auditor be ordered to cease prosecution of the distress warrant until the motion for a writ of mandamus can be heard and decided in court.

Upon hearing of the motion in vacation, upon notice, the judge granted the temporary orders as asked, and gave notice to defendants to appear and show cause in court why the mandamus should not be made peremptory.

Defendants pleaded to the jurisdiction of the Jefferson circuit court:

1.    Because the auditor's office was at Little Rock, the seat of government.

2.    Because the court had no authority to review his action in issuing the distress warrant.

The plea was overruled, and defendants then demurred to the petition :

1.    Because plaintiffs had mistaken their remedy.

2.    Because the proceeding is really against the state, seeking to affect its revenue as adjusted by the auditor.

3–4.    Because the petition shows that the auditor exercised an official discretion which can not be controlled by mandamus.

5.    The petition does not negative the idea that at the time of executing the bond the collector had no money in his hands for the revenue of the year.

6.    Petitioners do not show any authority vested in them to inquire into the acts of the auditor in adjusting the settlement of the collector's account.

7.    Because they deny the facts contained in the warrant, which are conclusive.

8.    Because their remedy is to have the facts certified to

the general assembly by the auditor, as provided in *sec. 2778, Gantt's Digest.*

9. Because they do not show that they have a clear legal right and no other remedy.

10. Because the petition is insufficient in law.

The demurrer was overruled, and the defendant, Crawford, responded to the petition, denying in detail most of the material allegations of the petition, insisting that the liability of Vaughan and his sureties is not to be confined to liquor licenses disposed of before the last of December, 1874, but extends to all received by him up to the time of his settlement in June, 1875. He says that the distress warrant was based upon information " official and otherwise" now on file in his department. He says the books in the Jefferson county clerk's office had been tampered with, and a false and fraudulent return made to the auditor, and that it was only a short time before the issuance of the distress warrant that he was enabled, by returns from the clerk's office, to ascertain the extent of Vaughan's deficiency. He denies, further, that the distress warrant was without notice to petitioners, but says that Bell, acting for himself and the others, had notice, and that the delay in issuing it was at his instance. He insists that Vaughan was delinquent in his settlement in 1875. He says that for balance of liquor licenses which came to Vaughan's hands during the time covered by the bond, and which includes $4,700 issued in 1875, he is due the state $4,293.48, for which the distress warrant issued.

It appears from the papers filed in the case, and brought up in the transcript, that the distress warrant complained of is one of three issued by the auditor against Vaughan and three separate sets of sureties upon his bonds as collector for the years 1873, 1874 and 1875. So far as they

apply to this particular case they show that on the fifteenth of June, 1875, Vaughan did come, by his deputy, before the auditor, and made settlement, and paid into the state treasury all sums with which he stood charged upon the auditor's books, and obtained his quietus. This he exhibited to his sureties of that year, who afterwards rested upon it until Vaughan became insolvent. At the time Vaughan made his settlement in 1875 no charges against him for liquor licenses had been reported by the clerk of the county, and none appearing, none were, of course, paid. Subsequently considerable sums on liquor license account were paid into the treasury by Vaughan through his sureties, and it was ascertained that he had returned licenses to the clerk for which he had been credited. The books of the county clerk had been kept in confusion with regard to the liquor license account, and no regular, formal report had been furnished the auditor at the times required by law.

Defendant Crawford, who has been auditor since January 8, 1877, and who issued the writ, testifies: That Vaughan, on the seventeenth of that month, brought to his office his papers and statements, showing, as he said, the amounts collected by him on account of the liquor licenses for the years 1873, 1874 and 1875. The auditor allowed all his credits except the sum of $6,500, which he rejected upon the affidavit of Paul Jacko (who had been clerk of the county court of Jefferson county since the seventeenth of October, 1876), declaring the same fraudulent. After rejecting this credit, the three distress warrants were issued for the three several years against Vaughan and the three sets of sureties. No full settlement had ever been made for either of the years, showing the amounts due for that year, on liquor licenses. Credits of payments made by Vaughan, and of liquor licenses returned to the

county clerk, were about that time allowed by the auditor, and apportioned on the accounts of the three years. He says he made this distribution because he deemed it just and equitable, and because there was no good reason why the whole amount should have been placed to the credit of any particular year. He says that as auditor he has made every effort to ascertain the correct condition of Mr. Vaughan's accounts as to liquor licenses. Much confusion and uncertainty existed regarding them, and he had great difficulty in arriving at a correct understanding. He employed two attorneys to assist him, and finally, on the twentieth of February, 1877, sent a special agent to Jefferson county to make an investigation. This agent made a *report of the facts* on the twenty-fourth of that month. "On this report," says the auditor, "on the information of the attorneys, and from information and data from various other sources, *I reached the conclusion* as stated, and upon which the distress warrant was issued."

There is other evidence (accepted as such, at least, in the case) going to raise a suspicion of fraud; or, at least, showing great carelessness and looseness in the management of the liquor license accounts in Jefferson county; and little doubt is left on the mind that the collector, Vaughan, is behind, on that account, to the extent claimed by the auditor, and that the sureties on his bonds are accountable for his misfeasance, neglect or fraud. But as to these matters the sureties have never as yet had day in court, and can not be precluded from showing differently, or from insisting, each lot for themselves, that the liability should be upon the others. They are not bound by the apportionment of credits made by the auditor upon his own *ex parte* investigations.

The court upon hearing, made the writ prohibiting fur-

1. COLLEC-TOR OF REV-ENUE:
Liability of his sureties.

ther proceedings on the distress warrant peremptory, and the auditor and constable appealed.

Several questions are presented by the record, all of which are not important to the decision of this court; but inasmuch as many of them concern the public interests to a grave extent, and are such as our public officers should fully understand, they will be noticed more in detail than would otherwise be considered necessary.

2. SUITS AGAINST THE STATE: Injunction against. By section 2 of an act of January 19, 1855, entitled an act " to protect the interests of this state," it was forbidden for " any person or corporation to sue, or implead, or move against the state, in chancery, or against any officer or person acting for or representing the same, except at law."

The state had then become complicated in embarrassments and difficulties of a purely business nature, arising out of her connection with and liabilities for the State and Real Estate banks ; and was endeavoring to save herself, as far as possible, out of the assets of those institutions. The act was passed to facilitate her movements in this regard, and to avoid vexatious interference on the part of bondholders, or others, through the chancery courts.   She assumed herself the power and prerogative to do justice in the premises, and was unwilling that she should be declared a trustee.   This was only the assertion of the common law prerogative of the sovereign, and comported with her dignity.   The section is to be construed in that connection, which is shown by the whole body of the act, which has reference alone to those bank matters.   There is nothing in this section to prohibit courts of chancery from enjoining individuals assuming to act in behalf of the state and as state officers, from acts which are not authorized by law 3. VENUE: Local jurisdiction. and which may produce irreparable mischief.   The property levied upon was mostly real estate of Jefferson coun-

Crawford, Auditor, vs. Carson, Ex., et al.

ty. The sale under a distress warrant would have clouded the title of the defendants therein, and the circuit court of said county had jurisdiction to inquire whether the distress warrant was legal, and, if not, to enjoin its execution.

Petitioners, however, doubting of this, did not seek their remedy by bill in chancery and injunction, but adopted the statutory remedy of mandamus. This, under our Civil Code, is now defined to be " an order of a court of competent and original jurisdiction, commanding an executive or ministerial officer to perform an act, *or omit to do an act,* the performance *or omission* of which is *enjoined* by law. *Gantt's Digest, sec. 4150.*

A writ of mandamus, in name and nature, and at common law, is something of a mandatory nature, compelling an act. BLACKSTONE says (*Book III, p. 110.*) that it is a writ requiring the person, court or officer, to *do* some particular thing, therein specified, which pertains to their office or duty. The writs to *prevent* the doing of an act by courts, or individuals, were those of *prohibition* and injunction. Mandamus was a writ of a moving nature, the proper writ to enforce obedience to an act of parliament, and hence only proper to compel quiescence where an act is itself, mandatory of something negative, where it *specially* directs the *not* doing of a thing which might be natural or otherwise proper. It would be to suppose that the legislature, in abolishing forms of action, meant also to abolish all meaning of terms and distinctions of things, to suppose that it meant in the case of ministerial and executive officers, to make the writ of mandamus perform a function hitherto unknown, and take the place of an injunction. The act must be confined to cases where the omission of something is positively and specially enjoined by express language. That was not the case in this instance, and the

4. MANDAMUS: Use of writ.

37

Crawford, Auditor, vs. Carson, Ex., et al.

petitioners have mistaken their remedy. But the petition, although misnamed, contains all the essential elements of a bill of injunction, and, if so presented on the equity side, discloses matter of which the circuit court of Jefferson county had jurisdiction. The prohibition against suing the state, or any officer representing her, in chancery, must be confined to such suits as seek to charge the state with some liability or duty, or to hold her or her officers as trustees of effects in their hands. Such and such only was the object of the statute. It would open the way to intolerable tyranny to exempt officers of the state from injunctions to restrain them from illegal though colorable acts of authority.

5. COLLEC-
TOR OF REV-
ENUE:

For what
liquor li-
cense lia-
ble.

With regard to the bond itself, it seems substantially in accordance with the law of 1873, and such as a distress warrant might be based upon if the statutory conditions had arisen. And with regard to its extent, it covered the whole term of office of the collector. There is no reason why he should not be chargeable, and his sureties with him, for moneys collected on licenses issued after the first of January, 1875. It was his duty to collect the money upon them and account for it, during his term of office, although they did not expire until the end of the calendar year. The bond recited that Vaughan had been commissioned as sheriff, and was *ex-officio* collector for the time prescribed by law; and was conditioned not only for the faithful performance of his duties as collector of the revenue for the year 1874, but also, that he should well and truly pay over *all* moneys collected by him by virtue of his office. Each set of sureties was bound and subject, under proper conditions, to distress, for all sums which he collected, or stood charged with, during the particular term of office for which they had become his sureties.

Crawford, Auditor, vs. Carson, Ex., et al.

It remains to consider the distress warrant itself, and the circumstances and grounds of its issuance. The power of the state to provide that summary method of coercing the paying in of its revenue is no longer questioned. It is not considered to be in violation of the constitutional provision against taking property without due process of law. Such summary proceedings are justified by the necessity of the government. When exercised in aid of the revenues of the commonwealth, they are for the benefit of all. They have no character of partiality or favoritism. They become, when confined to the sovereign, themselves due process of law.

6. DISTRESS WARRANT: When auditor may issue.

But they derive all their validity from the statute. They are dangerous to the citizen; sustained on one side by a high public policy, they are guarded on another by countervailing policies of equal potency. They can only be used under the circumstances and conditions prescribed. The law itself must confer the power to issue them, and the obligors, in a bond to the state, can not make a binding agreement, to be subject to them under any other conditions than those prescribed by law.

Waiving, for the present, the inextricable confusion resulting from the mistaken cross-references to sections as they exist in the original and pamphlet acts of 1873, and taking them as partially cured by their arrangement in Gantt's Digest, we find the following system:

For licenses sold, the collector was directed to settle with the county court at each term. The duty was imposed on that tribunal, in the first instance, to *ascertain the amount* due from him on that account, as well as moneys received from clerks, recorders and other *officers*, on account of taxes, fines, penalties and judgments. These settlements were required to be entered of record, so as to show what

is *due the state* and county respectively. This settlement might be compelled by attachment. It was made the duty of the clerk immediately afterwards, to *certify to the auditor* the amount due the state, and of the collector, within fifteen days thereafter, to pay *the same* into the state treasury. Nothing could be more explicit than this. It made the certificate of the clerk the only basis upon which the collector could be required to settle with the auditor. That certificate was based upon the determination of a court of record, of competent jurisdiction, and, of course, conclusive until reversed or annulled. No special provision was made to authorize a distress warrant by the auditor in case of failure to pay in amounts found due on these *quarterly* settlements. If they were fraudulent (and it was the duty of the auditor to inquire into it, if he supposed they were), he might institute proceedings through the prosecuting attorney of the district to have the record corrected by bill in chancery or other appropriate proceeding; but he had no authority vested in him to disregard the determination and record of the county court, restate the account, and issue a distress warrant for the balance, as restated. The judgment and record of the county court must inure as well to *protect* the collector and his sureties as to *charge* them.

If the county court should fail in its duty of compelling a settlement, it might be coerced thereto by superior courts, and the matter put in proper train. It does not follow that the auditor must assume the duty of the county court and perform its functions in this regard ; and, upon ascertainment of a balance, execute his judgment by distress warrant. However just this may appear, it is simply unauthorized by law, and its justice and safety are not questions for the court. Doubtless the auditor may, and should

search out all sums due the state, and deserves support and commendation in his efforts to recover them; but regular means are provided by suit. The extraordinary remedy must be confined to its appointed channel. See *sec. 160 et seq.*

There being then no *special* provision for a distress warrant to collect the quarterly balances which were required to be paid after each settlement, we proceed to inquire whether there be, in the act, any more general provision for a distress warrant, which will include these balances on settlement, or which would have been shown to be due if settlements had been honestly made.

A provision authorizing any distress warrant at all is only found in *sec. 172.* To trace its scope is not easy, on account of the confusion of its references. It is made the duty of the auditor to issue it against "such delinquent and his sureties," "*immediately* after the time specified in *sec. 168*," "to satisfy the amount with which such delinquent is chargeable, together with 5 per cent. per month thereon until paid," etc. The first thing apparent is the care taken by the state to enjoin prompt action on the part of the auditor. He is not granted any option to extend the time. This, however, is for the benefit of the state, and his laches could not be complained of by the collector or his sureties, unless upon some special equitable ground; certainly not if the delay was unavoidable, or made by consent of the sureties.

We must look elsewhere for the "time" and the "amounts," and delinquents referred to. *Sec. 168* affords no light on either. It was *probably* meant for *171*, which, in this act, corresponds with *168* of the former revenue act of 1871. Assuming this to be so, without deciding it judicially, we find the time specified for paying money into the state treasury and taking his receipt, by collectors, to

be " within fifteen days after the settlement required in *sec. 110;*" and we find, also, the mode of computing the " amount" with which the delinquent is to be charged.

This section embraces, too, as delinquents, all collectors and others bound by law to pay money directly into the state treasury, and who fail to do so. It would cover sums collected upon liquor business and ascertained to be due the state by the county court. To fix the *time*, however, we must go back to *sec. 110*, which provides for no settlement itself, but refers to "*such*" settlements; and tracing the sections to the last settlement provided for, we find them to be: First, that directed to be made by the collector with the county clerk (in *sec. 108*) immediately after the sale of lands for delinquent taxes. This settlement was to ascertain the balances with which the collector stood charged on the tax-books, which were to be certified by the clerk, and the settlement itself reported to the county court and made matter of record; and, second, that which (by *sec. 109*) the collector was required to make, immediately afterwards, with the auditor, for state taxes charged on the tax-book.

This last settlement is doubtless the one referred to in *sec. 171*, and required to be made with the auditor immediately after the sale of delinquent lands of each year, and as soon as practicable after the settlement of the county revenue with the clerk. It fixes a point of time in each year, after which, in fifteen days, all persons bound by law to pay money directly into the treasury of the state must do so, or suffer the penalties and be amenable to distress. But it can not be said of a collector that he is bound to pay money directly into the state treasury until the balance be shown by the tax-books and settlements made by them, or by certificates of the county clerks of settlements

Crawford, Auditor, vs. Carson, Ex., et al.

made of record in the several counties, or by the judgment of some competent court in a suit. The auditor is not vested with any judicial power to inquire into frauds and to determine definitely thereon what sums may be justly due the state, and issue executions therefor.

The state, however, is not left remediless in any case. It is the duty of the auditor to be vigilant in securing the dues to the state, and the steps taken by the defendant, Crawford, in this case, have all been such as were commendable, up to the time of the issuance of the warrant. It was his duty to be watchful of official delinquencies, and to direct prosecutions in the name of the state for all such as affected the assessment, collection and payment of the revenue. He mistook the remedy in this case, in supposing that a distress warrant would lie.

It was not ground of demurrer that the complainants, on their part, had mistaken their remedy in adopting the proceeding by mandamus. (See *sec. 4461 Gantt's Digest*; also, *sec. 4564*). But it is the duty of the courts in clear cases, where the entertainment of a writ in the form presented would lead to a confusion of all boundaries between proceedings at law and in equity—and between ordinary actions and special proceedings—to refuse, of their own motion, to do so. This is due to a fair experiment of the Code, that it may be administered in its true and rational extent, and perfected as a harmonious system.

In cases of doubt, or where there are mingled elements of law and equity, parties may be held to abide by proceedings to which they have not objected, but it would lead to an utter wreck of all system, and bring the administration of justice into contempt, to allow parties, by tacit consent, to ignore all order and determine their controversies by any form of proceedings, upon which ever side of

7 DEMURRER
Mistake
of remedy.
Mandamus
Injunction

the court they may elect.   No such looseness in this case was intended by court or attorneys.   The peculiar terms of the Code on the subject of mandamus have led to the error, but the principle applies.

The court should have refused to proceed upon the writ of mandamus, unless the petition had been reformed and transferred to the equity side.   The proceeding by mandamus is extraordinary, and should not be used except in cases where there is no other appropriate remedy.   Here was a case where real property was about to be seriously clouded by improper proceedings.   Perhaps, also, the remedy by *certiorari*, as the same has been enlarged by statute, would have sufficed.

Doing here what the court below should have done, we will dismiss the petition.   After the views herein expressed, it may be well presumed that the auditor will proceed no further upon the distress warrant, but recall the warrant and proceed by suit, or take such other steps as may seem expedient and meet.