## MANTHEY *v.* VINCENT. '

1. CONVICTS — STATE PRISON — TEACHING MECHANICAL TRADES— CONSTITUTION—CONSTRUCTION.

Section 3, article 18, of the Constitution, prohibits the manufacture, in the State prison, of articles the chief supply of which for home consumption is made in the State, in all cases in which manufacturing cannot be carried on without teaching the convicts the trade appertaining to such manufacture; a prohibition of the practical as well as the theoretical teaching of the forbidden trades being intended.

2. CONSTITUTIONAL LAW — CONSTRUCTION — CANONS — OBVIOUS MEANING.

Possible or even probable meanings, when one is plainly declared in the Constitution itself, the courts are not at liberty to search for elsewhere.

3. SAME—CONTEMPORARY AND PRACTICAL CONSTRUCTION.

Contemporary and practical construction by the State prison authorities of section 3, article 18, of the Constitution, by carrying on certain manufactures in the prison, cannot be admitted as a determination that such section does not prohibit such manufactures, the meaning of the section not being doubtful.

4. CONVICTS — STATE PRISON — TEACHING MECHANICAL TRADES — BROOM MAKING.

Section 3, article 18, of the Constitution, prohibits the manufacture of brooms in the State prison by the labor of convicts unskilled in that art at the time of their incarceration, though the process of manufacture is so divided that no convict is taught to make an entire broom, but is taught to perform but one of thirteen or more distinct operations.

5. SAME—ARTICLES NOT SOLD IN MICHIGAN.

That the articles manufactured in the State prison in violation of section 3, article 18, of the Constitution, are not sold in Michigan is an immaterial circumstance.

6. CONSTITUTIONAL LAW—CONSTRUCTION OF CONSTITUTION —DUTY OF COURT—DISASTROUS CONSEQUENCES.

· Fear of disastrous consequences furnishes no reason for declining to give the Constitution effect according to its obvious meaning; the remedy, in case the fears do not prove groundless, being with the people.

Appeal from Wayne; Hosmer, J.  Submitted May 3, 1906.  (Docket No. 144.)  Decided July 23, 1906.

Bill by Martin Manthey and others against Alonzo Vincent, warden, the board of control of the Michigan State prison, and the Illinois Broom Company, to enjoin the performance of a contract for the manufacture of brooms. From a decree for complainants, defendants appeal. Affirmed.

*Edward S. Grece* (*F. A. Baker* and *Hal H. Smith,* of counsel), for complainants.

*John E. Bird,* Attorney General (*Charles W. McGill* and *Michael P. Bourke,* of counsel), for defendants warden and board of control.

*Arthur C. O'Connor,* for defendant Illinois Broom Co.

CARPENTER, C. J.  December 11, 1902, the warden and board of control of the State prison at Jackson, defendants herein, agreed to "hire and let" to the Illinois Broom Company, another defendant herein, "for the term of eight years from and including the 15th day of February, A. D. 1903, the labor and services of 50 convicts." Said Illinois Broom Company agreed to employ these convicts in shops within the prison walls "in the business of manufacturing brooms and whisks." While defendants were proceeding to perform this contract, complainants, some of whom are journeymen broom makers, and some of whom are manufacturers of brooms, in this State, commenced this suit in equity for the purpose of enjoining the performance of said contract.  The case was heard in the circuit court upon pleadings and testimony taken in open court, and a decree rendered in favor of complainants upon the ground contended for by them that the performance of this contract was forbidden by section 3, art. 18, of our State Constitution, reading:

"No mechanical trade shall hereafter be taught to convicts in the State prison of this State, except the manu-

facture of those articles of which the chief supply for home consumption is imported from other States or countries."

From this decree defendants appeal, and they ask a reversal solely upon the ground that the contract in question can be and will be performed without violating the constitutional provision above quoted.

The testimony proves that the chief supply of brooms used in this State is made in this State; that the art of broom making is a mechanical trade; and that the convicts whose labor is used in performing the contract in question were, when they commenced to work thereon, entirely ignorant of said art. As this contract has been and is now being performed, these convicts do make perfect brooms, but no one convict makes such a broom. The work is divided into 13 branches. To illustrate: One of these branches is that of sewing the brooms, and another that of sorting the corn from which the broom is made. A convict learns to do the work in one, and only one, of these branches; that is, he learns to make one-thirteenth of the broom and no more.

Is the performance of this contract prohibited by the constitutional provision ? That depends upon the proper construction of its language.

"No mechanical trade shall hereafter be taught to convicts in the State prison of this State, except the manufacture of those articles of which the chief supply for home consumption is imported from other States or countries."

This language is clear. It prohibits the teaching to convicts in the State prison of any mechanical trade for the manufacture of articles of which the chief supply for home consumption is made in Michigan. The prohibition extends that far and no farther. It does not prohibit convicts being taught any trade for the manufacture of articles of which the chief supply for home consumption comes from without the State. And I should not say that it prohibits the manufacture of any articles whatso-

ever—even those of which the chief supply for home consumption is derived from home manufactories—provided. the convicts are taught no mechanical trade. It does not follow, however, that this provision does not, and was not intended to, affect the manufacture of such articles. Convicts cannot manufacture those articles without being taught the trade unless they already know it. The people, when they adopted this provision, may very well be assumed to have known what we all know, that there would be among the convicts in the State prison so few skilled mechanics that the possibility of a profitable manufactory being therein conducted without teaching the convicts the trade of said manufacture was a very remote one indeed. It follows, therefore, that the enforcement of this provision prevents—and we may therefore properly assume that it was intended to prevent—such manufacture.

The claim is made by defendants that, since the Constitution prohibits teaching and does not prohibit manufacturing, the labor of convicts may be used in manufacturing, even though said convicts are thus taught the mechanical trade of making the articles thus manufactured. This is to contend that the constitutional provision in question prohibits the teaching of a mechanical trade as an educational measure, but permits its teaching as a step in industrial production. That is, that it prohibits theoretical teaching, but permits practical teaching. What evidence is there that the people in adopting this constitutional provision intended to prohibit only theoretical teaching? There is certainly no such evidence in the language of the Constitution. That prohibits the teaching of mechanical trades. Presumably this means all teaching—practical as well as theoretical—of mechanical trades. It certainly prohibits practical teaching, for that, when the Constitution was adopted, was the ordinary, if not the only, method of teaching a mechanical trade. As we do not find in the Constitution any evidence to limit the

apparent scope of this prohibition, our right to look else-where for such evidence may be questioned.

"Possible or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere." Cooley on Constitutional Limitations (7th Ed.), pp. 89-91.

In this case, however, it is proper that we should consider such evidence, for without considering it we cannot sustain defendant's contention, and by considering it—as will hereafter appear—we only strengthen the conclusion we reach without it. We proceed therefore to state that evidence which is the history of the adoption of the constitutional provision under consideration. That history will be found both interesting and instructive.

Act No. 77 of the Laws of 1839 authorized the authorities in control of the State prison to use the labor of convicts in "manufacturing and mechanical business;" the only restriction being that the employment furnished should be "most beneficial to the public and best suited to their (the prisoners') various capacities." Act No. 81 of the Laws of 1842 authorized the prison authorities to enter into contract "letting the convicts for said labor (the labor of said convicts) of all or any of the branches now carried on or may hereafter be carried on in said prison." In 1843 the platform of the democratic party (then the dominant party in this State) contained this resolution:

"Resolved, that this convention earnestly recommend the next legislature of the State to enact such laws in relation to the penitentiary discipline that the mechanical labor of the convicts shall not come into competition with the mechanical labor of our citizens."

Governor Barry, who was elected upon this platform, in his annual message, in January, 1844, recommended legislation in accordance therewith. The house committee on State prison, to whom was referred this part of the governor's message, reported:

"The inspectors of the State prison in their report, and also the governor in his message, recommends and suggests the propriety of establishing by law at this session of the legislature, a prison discipline, relative to mechanical labor, by giving it such direction as will prevent competition between convict and free labor. *  *  *

"It is admitted that labor is an essential part of the most approved system of prison discipline, and is important to the State in a financial point of view, yet your committee believes that a system may be adopted that will protect the rights and interests of the honest and industrious mechanic, and that will be consistent with the interests of the State. Your committee, for the purpose of carrying out their views more fully, herewith submit a bill." House Journal 1844, p. 108.

That bill was passed by the house, but rejected by the senate. It was not preserved, and its precise phraseology is not known. It may have been, and it may not have been, like the constitutional provision in question. In revising the statutes, in 1846, the legislature inserted in the chapter (172) headed, "Of the State Prison and Government and Discipline Thereof," section 16, which read:

"No mechanical trade shall hereafter be taught to convicts in the State prison of this State, except the making of those articles of which the chief supply for the consumption of the country is imported from other States or countries."

It will be observed that the constitutional provision under consideration follows this language almost precisely. This section was repealed by the legislature in 1848. See Act No. 196, Laws of 1848. In the convention which framed our present Constitution, a motion was made to strike out the constitutional provision under consideration. The only argument in support of this motion was made by Mr. Pierce, a member of the convention from the county of Calhoun. He said:

"I have examined the prison, and I do not find an article manufactured there in which the market is overdone. Everything sold there is surplus production. I do

not believe it lowers the value of wagons one cent. It does not injure the workingmen of Jackson $1 in 365 days. * * * It is so much value added to the State without injury to any one." Convention Debates 1850, p. 826.

In opposition to this motion Mr. Wilbur F. Storey, who subsequently attained fame as the editor of the Detroit Free Pross, and later as the founder and editor of the Chicago Times, then a member of the convention from the county of Jackson, said:

"This section was a provision in the Revised Statutes of 1846. It was placed there after considerable agitation among the people, and after the whole subject had been very thoroughly discussed in both branches of the legislature. * * * It was repealed, as I believe, through the influence and for the benefit of interested contractors at the prison. * * *

"And what was the consequence of the repeal of this section? It was, sir, that the then existing contracts were extended some five years, at the low and inadequate prices previously paid, when, had the section been allowed to stand, and a reletting of the labor of all the convicts taken place at the expiration of the existing contracts, an advance of from 40 to 60 per cent. upon the former receipts from contractors might have been realized by the State. * * *

"The most profitable contract now existing is one which does not interfere with mechanical trades in the State. * * * Whether the prison will support itself or not is a question of minor importance, when compared with the great consideration of right and wrong involved. In my view, the State has no right to erect a monopoly which will interfere with the single-handed industry of any class of her citizens. Every class of labor is entitled to the protection of the State, rather than to be brought into competition with her. Such competition is unfair, unjust, and ruinous. * * *

"In those branches of business in which they (the convicts) are engaged particularly (the manufacture of boots and wagons) the mechanics in Jackson cannot compete with them; they have ceased work; they are driven from their shops. * * *

"There is, sir, a moral question of some magnitude involved here. The convicts are taught trades in the prison,

and when they go out they are very likely to seek employment in shops where a like business as they have learned is carried on. If they have reformed, and become honest men, this is all well. But, if not, if they are still foul with crime, what is the effect upon those they come in contact with—the journeymen and apprentices that fill the work-shops of our cities and villages? Sir, it is at least degrading to the honest mechanic, and in some cases the contamination is fatal. * * * I may be asked, why not leave the whole subject to the legislature, and why put this section in the Constitution? Simply for the reason that I would place the provision beyond the power of repeal through the efforts of interested contractors or other persons. This much, surely, is due to the great mechanical interests of the State." Convention Debates 1850, pp. 827, 834, 838.

Substantially the same arguments were advanced by several other members who opposed the motion to strike out this provision, and that motion was defeated.

It is apparent from this evidence that the constitutional provision under consideration was designed to accomplish two objects:

(a) To protect the citizens of Michigan engaged in manufacturing articles of which the chief supply for home consumption is made in Michigan (and this it may well be supposed will protect all our citizens extensively engaged in manufacture) from the competition of State prison convict labor.

(b) To lessen the probability that the honest mechanics of Michigan should be compelled to associate with discharged convicts because the latter had been taught the trade of the former in the State prison of this State.

It was desired to accomplish these objects and at the same time to permit—perhaps to encourage—said convicts to engage in manufacturing all other articles and to learn all other trades. It is not for us to decide that these objects were or were not commendable. That was a question for the people to decide. They have decided it. We are bound to bow to that decision and to construe this provision as they intended it should be construed. Nor can it be said that the language of the provision in

question was not calculated to accomplish these objects. It is true that it still left an opportunity for competition in the manufacture of those articles of which the chief supply for home consumption is made in Michigan, provided those articles might be manufactured without teaching the convicts a trade. But, for the reasons we have already pointed out, the prohibition of teaching the trade of manufacturing these articles amounted to a practical prohibition of manufacturing them. We conclude, therefore, that the constitutional provision under consideration—and this is true whether its language be construed with or without the aid of the foregoing evidence—prohibits the practical as well as the theoretical teaching of forbidden trades. It prohibits the manufacture of articles the chief supply of which for home consumption is made in Michigan, if that manufacture cannot be carried on without teaching State prison convicts a mechanical trade.

We think there is nothing inconsistent with these views in *People* v. *Inspectors & Agent of State Prison*, 4 Mich. 187. That case is authority for this proposition and for this proposition only, viz., that a private individual has no right to enforce the constitutional provision under consideration by a writ of mandamus. In the course of that opinion it was said:

"Again, it may be observed that the provision of the Constitution does not forbid the manufacture, in terms at any rate, of any article in the prison, but that no trade shall be taught there, except the manufacture of those articles, the chief supply of which is imported from other States. Now, the relator does not allege that he has been injured by the trade of wagon making having been taught to the convicts simply, but that he has been injured by that, and by the manufacture of wagons in the prison, which, as we have seen, the language of the Constitution does not forbid."

If there is anything in this language opposed to the views stated in this opinion, it is to be found in the concluding words above quoted. The learned judge who wrote that opinion does not say that the Constitution does

not, under any circumstances, forbid the manufacture of wagons in the prison. He does say that "the language of the Constitution does not, *as we have seen* [that is, it does not in terms], forbid" such manufacture. Nor can we agree with defendants' counsel that the construction placed upon this provision by the State prison authorities —it is claimed they have carried on the manufacture of these prohibited articles for 60 years—is binding upon the courts as a contemporaneous and practical construction. I doubt if the evidence in this record proves that they have so manufactured said articles. If it does, it, is incompetent evidence to determine the proper construction of the provision in question. Says Justice COOLEY in his work on Constitutional Limitations (7th Ed.), pp. 106, 107:

"We think we allow to contemporary and practical construction its full legitimate force when we suffer it, where it is clear and uniform, to solve in its own favor doubts which arise on reading the instrument to be construed."

Here, as we have shown, such doubts do not arise, and we cannot, therefore, give any force whatever to the construction placed upon this provision by the State prison authorities.

We come now to the consideration of the contention of defendants' counsel that as the brooms are made under the contract in question, no mechanical trade is taught to the State prison convicts. Defendants argue that, because no convict is taught to make a complete broom, no mechanical trade is taught. This is an unsound argument. Its fallacy lies in the assumption that the Constitution prohibits only the teaching to the individual convict of a complete trade. The Constitution prohibits the State prison convicts—and this means the convicts collectively as well as the convicts individually—being taught the mechanical trade of manufacturing articles of which the chief supply for home consumption is made in Michigan. In performing the contract in question such a trade is

taught.   The art of broom making is a mechanical trade. A number of convicts ignorant of the art of making brooms are taught to make them.   It follows that they are taught a mechanical trade.   To hold otherwise would permit the prison authorities to do the very thing which the people, when they adopted this provision, intended to prevent.

The testimony in this case proves that the brooms made under the contract in question are not sold in Michigan, but are sold in other States.   Defendants' counsel do not claim that this is a material circumstance.   We agree that it is not.   The people who adopted the constitutional provision in question did not except from its operation the manufacture of articles sold in other States.   It is not difficult to imagine reasons why they made no such exception.   Such an exception would have tended to defeat their objects.   For those articles, though sold out of Michigan, might, nevertheless, be sold in competition with articles made in Michigan, and the convicts employed in making them might none the less be taught a prohibited trade.   Whatever were their reasons they made no exception and we can make none.

Defendants' counsel express the fear that disastrous consequences will follow from an affirmance of the decree of the lower court.   We think these fears are groundless; but, if they are not, they cannot move us.   We would be faithless to the trust the people have reposed in us if we permitted them to deter us from construing this provision as we do—from construing it as the people intended it should be construed.   If disastrous consequences ensue, the people are responsible for them, and the people can avert them by amending their Constitution.

The decree appealed from should be affirmed, with costs against the defendant the Illinois Broom Company.

MCALVAY, MONTGOMERY, HOOKER, and MOORE, JJ., concurred.