ATTORNEY GENERAL, *ex rel.* HUDSON, *v.* COMMON COUNCIL
OF CITY OF DETROIT.

1. CONSTITUTIONAL LAW — MUNICIPAL  CORPORATIONS — BONDS —
PURCHASE OF PUBLIC UTILITIES.

Under sections 23 and 24, Art. 8, Constitution of 1909, munici-
pal corporations are permitted to issue bonds for the pur-
chase or acquisition of public utilities in excess of the limi-
tation upon general bonded indebtedness, the excess to be
secured only by the property purchased, without creating
a debt against the municipality.

2. SAME—BONDS—LIMITATION OF INDEBTEDNESS.

None of the provisions of the Constitution prohibit the use of
both kinds of bonds, within the limitations prescribed.

3. SAME.

Unless the bonds issued upon such public utility create an in-
debtedness on the part of the city, in excess of the prescribed
limit, they violate no provision of the Constitution and there-
fore Act No. 279, Pub. Acts 1909, permitting the issuance of
such nonliability bonds, without limit, is valid.  If, however,
they should become an indebtedness of the city, the extent
of such indebtedness is limited by the act to four per centum
of the assessed value of the property.

4. SAME—STATUTES—MUNICIPAL CHARTERS—REVISION.

Act No. 279, Pub. Acts 1909, is not unconstitutional for failing
to give the electors of municipalities part in framing amend-
ments to the charter; for the Constitution does not purport
to point out the method by which amendments shall be
framed, and, although it delegates the power to electors to
amend their charter, indirect means of proposing the amend-
ment were properly provided for by the act, which permits
twenty per centum of the electors to initiate amendments.

5. MUNICIPAL CORPORATIONS—AMENDMENT OF CHARTERS—DETROIT
CHARTER—REVISION.

Since it was intended by Act No. 279, Pub. Acts 1909, that
cities incorporating or revising their charters under its pro-
visions should include therein the requirements of sections 3
and 5 of the act, a proceeding to amend the charter of the

164 MICH.—24.

city of Detroit, without first revising the charter so as to contain such required provisions, is invalid.

6. SAME — STREET RAILWAYS — PUBLIC UTILITIES — CHARTERS OF CITIES.

    Amendments provided for in section 21 of the act to be submitted to the vote of the electors, are amendments to charters framed and adopted under the general law, not to charters which remain in force until revised or replaced.

7. MANDAMUS—RESTRAINING ACTION—INJUNCTION.

    While mandamus does not ordinarily restrain action, a function of the writ of injunction, in view of the prior rulings of this court (*Elliott* v. *City of Detroit,* 121 Mich. 611 [84 N. W. 820]), mandamus will issue to prevent the holding of a special election to amend the charter of the city of Detroit, so as to authorize the acquisition and construction of street railway lines; but the. opinion in such case is overruled. OSTRANDER, C. J., and BLAIR and MCALVAY, JJ., dissenting.

Certiorari to Wayne; Mandell, Hosmer, and Rohnert, JJ., sitting *in banc.* Submitted October 12, 1910. (Calendar No. 24,152.) Decided February 1, 1911.

Mandamus by Franz Kuhn, attorney general, on the relation of Joseph L. Hudson, George H. Barbour, Russell A. Alger, Jr., Charles A. Ducharme, Fred T. Moran and Henry B. Joy, against the common council of the city of Detroit, to restrain the submission of a proposed amendment to the municipal charter to a vote of the electors of the city. An order denying the writ is reviewed by relator by writ of certiorari. Reversed and writ granted.

*Angell, Boynton, McMillan & Bodman* and *Walker & Spalding,* for appellant.

*P. J. M. Hally,* for appellee.

HOOKER, J. I am of the opinion that, if the relators have a remedy at this stage of the proceedings, it should be by injunction bill, and not by mandamus:

(1) Because mandamus issues to command action, and not inaction.

(2) Because there is another adequate remedy for any one entitled to restrain the council.

In Merrill on Mandamus, § 43, mandamus and injunction are contrasted:

" Mandamus and injunction should not be confounded. The latter is used to prevent action, to maintain affairs *in statu quo.* The former is compulsory, commanding something to be done. An injunction is preventive and protective merely, and not restorative. It interposes between the complainant and the injury he fears or seeks to avoid. If the injury be already done, the writ can have no operation, for it cannot be applied correctively so as to remove it. It is not used for the purpose of punishment, or to compel persons to do right, but simply to prevent them from doing wrong. It is sometimes used as an affirmative remedy, but only by the chancery court to carry into effect its own decrees, commanding the party not to allow things to continue in the condition in which they have been allowed to become. Mandamus, however, is compulsory and requires the doing of an act. It lies to command the doing of what ought to be done, and not to undo what has been done. It does not revise nor correct action. It cannot command to abstain from a tort or abuse of office. It never had the effect of the old writ of *de molestando.* It will be refused to prevent one claiming to be elected from exercising his office or to enjoin him from qualifying. When officers requested a mandamus to prevent others from molesting them in the exercise of the functions and powers of their offices, the court refused the writ, stating that, if the writ were issued for such cause, it would become merely a substitute for an injunction. Such substitution will not be allowed."

In *Crawford* v. *Carson,* 35 Ark. 565, mandamus was asked to prevent the auditor from prosecuting a distress warrant. The court said:

" A writ of mandamus, in name and nature, and at common law, is something of a mandatory nature, compelling an act. Blackstone says (Book 3, p. 110) that it is a writ requiring the person, court, or officer to do some particular thing, therein specified, which pertains to their office or duty. The writs to prevent the doing of an act by courts, or individuals, were those of prohibition and injunction. Mandamus was a writ of a moving nature, the proper writ to enforce obedience to an act of parliament, and hence only proper to compel quiescence where

an act is itself mandatory of something negative, where it specially directs the not doing of a thing which might be natural or otherwise proper. It would be to suppose that the legislature, in abolishing forms of action, meant also to abolish all meaning of terms and distinctions of things, to suppose that it meant, in the case of ministerial and executive officers, to make the writ of mandamus perform a function hitherto unknown, and take the place of an injunction. * * *

"It was not ground of demurrer that the complainants on their part had mistaken their remedy in adopting the proceeding by mandamus. But it is the duty of the courts in clear cases, where the entertainment of a writ in the form presented would lead to a confusion of all boundaries between proceedings at law and in equity— and between ordinary actions and special proceedings—to refuse, of their own motion, to do so. * * * It would lead to an utter wreck of all system, and bring the administration of justice into contempt, to allow parties, by tacit consent, to ignore all order and determine their controversies by any form of proceedings, upon whichever side of the court they may elect. * * *

"The court should have refused to proceed upon the writ of mandamus, unless the petition had been reformed and transferred to the equity side. The proceeding by mandamus is extraordinary, and should not be used except in cases where there is no other appropriate remedy."

See, also, *People, ex rel. Faile,* v. *Ferris,* 76 N. Y. 326.

In *Legg* v. *City of Annapolis,* 42 Md. 226, the court said:

"Mandamus is a writ commanding the performance of some act or duty, therein specified, in the performance of which the applicant for the writ is interested, or by the nonperformance of which he is aggrieved or injured. *Reg.* v. *Bishop of Chichester,* 2 Ell. & Ell. 209. But as simply a preventive remedy it has never been used, so far as we have been able to discover. The nature of the writ, and the end for which it was framed, direct upon what occasion it should be used. It was introduced to prevent disorder from a failure of justice and defect of police. Its use is therefore confined to those occasions where the law has established no specific remedy, and

where in justice and good government there ought to be one.  6  Bac. Abr., Tit. Mand. p. 418  *  *  *  Chief Baron Comyns, in his Dig. Tit. Mand. (B), lays it down as settled that a mandamus does not lie to prevent a molestation against law.   The same principle is stated by Tapping in his work, as the settled law.   Tapp. on Mand. pp. 189, 190.   Taking this to be an established principle upon the subject, there is no proper case stated in the petition of the appellees to justify the issuing of the writ.  *  *  * To grant the writ in such case would be simply making it a substitute for an injunction."

The court has asked counsel to furnish briefs, and both counsel appear to have been industrious in the effort to find Michigan cases upon the question.  We have found an overwhelming support to the contrary rule as to injunctive remedies outside of this jurisdiction both in this country and in Europe.  We have found but one case sustaining relator's contention outside of Michigan, viz., *Gayle* v. *Owen County Court*, 83 Ky. 61, where mandamus was considered to be the proper remedy to prevent the judge and clerk of a county court from recording the vote upon a local-option law when the law was unconstitutional.   Of this Merrill says in a note:

" It is not seen why an injunction would not have been the proper remedy, and no authority is cited in support of the practice by that court."

Doubtless counsel considered the question settled by Michigan cases, and that other authorities were unimportant, and we should agree with them if we can say that it is so settled by our decisions.  We will review these cases so far as counsel have cited them.

In *People, ex rel. Russell,* v. *Inspectors of State Prison*, 4 Mich. 190, a mandamus was sought to prevent the letting of prison contracts.  The court refused the writ.   It said in an opinion by COPELAND, J.:

"Still we think the relator has mistaken his remedy; that the relief he seeks cannot be maintained under a mandamus.   A mandamus is not a preventive writ.   Its office is to put inferior tribunals or public persons in

motion. It commands the performance of ministerial acts, or, being addressed to subordinate judicial tribunals, requires them to exercise their functions, and render some judgment in cases before them. *Ex parte Nash*, 15 Ad. & Ellis, 15, 92; *Chase* v. *Canal Co.*, 10 Pick. [Mass.] 244; *Strong, Petitioner*, 20 Pick. [Mass.] 484. In the latter case the court say:

" ' In every well constituted government the highest judicial authority must necessarily have a supervisory power over all inferior or subordinate tribunals, magistrates, and all others exercising public authority. If they commit errors, it will correct them. If they refuse to perform their duty, it will compel them. In the former case, by writ of error; in the latter, by mandamus.'

" The office sought of the writ in this case is to restrain the defendants from doing certain things they are alleged to have in contemplation."

Also:

" Whether the decision of the agent is final or not, and in no way subject to revision, it is not necessary to determine. It is only necessary now to say the relator cannot obtain the relief he seeks under the writ prayed for."

This case hardly supports relator's claim, and unqualifiedly commits this court to the contrary doctrine. We may mention, in passing, that when a similar question arose recently the admonition of this case was heeded and relief was sought by injunction bill, and the jurisdiction was sustained and relief granted as prayed. See *Manthey* v. *Vincent*, 145 Mich. 327, 335 (108 N. W. 667). This demonstrates that there is another remedy, and, under innumerable cases in our reports, this should of itself preclude relief, if such is an adequate remedy.

*People* v. *Insurance Co.*, 19 Mich. 393. In this case a mandamus compelled an insurance company to submit its books to an examination by the insurance commissioner, a duty prescribed by law. It was compelled by mandamus to do so. Apparently there was nothing in the nature of injunctive relief sought, and no such question was raised. It was claimed that indictment or quo warranto was an adequate remedy. The court held not,

upon the ground that such remedy was not adequate, as it clearly was not. This case is not in point on the question of injunctive relief, and in my opinion is distinguishable on the subject of other remedy.

In *People* v. *State Treasurer*, 24 Mich. 468, it was held that mandamus was the only safe remedy to compel a delivery of bonds of which the treasurer was the lawful custodian. The petition prayed action and not restraint.

In the case of *Giddings* v. *Secretary of State*, 93 Mich. 1 ( 52 N. W. 944, 16 L. R. A. 402 ), relator prayed both injunctive and active relief. The court compelled the respondent to give the notice required by law. That necessarily involved the omission to give another notice which the court restrained, and which would have been ineffective after the decision of the case had it been given. The court had jurisdiction to compel the giving of the notice required by law. We do not discover that the questions now under discussion were raised.

*Elliott* v. *City of Detroit*, 121 Mich. 611 ( 84 N. W. 820 ), came to this court on certiorari to the Wayne circuit. No opinion was filed. The reporter in his statement of facts said that the case was removed to this court by certiorari where the decision and opinion of the lower court were affirmed. It is impossible, at this time, to ascertain what authority there was for the statements of the reporter, as there is nothing, on file or of record, to show what the court said or did or that the cause was argued. An examination of the files, however, indicates that the question of the fitness of the remedy sought was raised in the circuit court. There is nothing to indicate that the question of injunctive relief was discussed or considered there or here. There is nothing to show what questions were discussed or waived here. If, therefore, this case is a precedent on these questions, it must be merely by force of the fact that the relief was granted. In my judgment this case should not be considered conclusive of the question, but should be treated as the misapplication of the rule through inadvertence. I cannot

conceive that the court intended to overrule the case of *People, ex rel. Russell,* v. *Inspectors, supra,* or that it would deliberately overrule any case without referring to it, and so stating. It is a significant fact that this is the only case that counsel have found where a writ of mandamus has issued to compel inaction alone, and it is also significant that applications of that kind have not been frequent, if it is a proper practice.

The cases of *Maclean* v. *Wayne Circuit Judge,* 52 Mich. 257 (18 N. W. 396), and *Tennant* v. *Crocker,* 85 Mich. 328 (48 N. W. 577), required the vacation of orders and involved affirmative action. *Renaud* v. *Court of Arbitration,* 124 Mich. 648 (83 N. W. 620, 51 L. R. A. 458, 83 Am. St. Rep. 346), was similar and included an order on application for a writ of prohibition, which alone was sufficient to dispose of that case.

Several cases were cited where circuit judges have been compelled to vacate orders for preliminary injunctions. That is a common practice where they are issued contrary to law. If we follow the practice indulged in in *Elliott* v. *City of Detroit, supra,* it is obvious that we cannot refuse it in any mandamus case where there is another remedy by bill in chancery, if the refusal will be followed by greater expense or inconvenience. We have seen that there is a remedy in equity in this controversy, and that remedy is still available. We have refused to grant this writ in innumerable cases where an action at law or suit in chancery was available, and we have endeavored to be consistent in our adherence to this fundamental rule relating to the remedy by mandamus, as we should be to the companion principle that injunctive relief is contrary to the very nature of the writ. We should not allow the former rule to be overturned by the one inadvertent violation of that rule, shown to have occurred in the *Elliott Case.* The same identical thing happened in the case of *Carpenter* v. *St. Clair Circuit Judge,* 122 Mich. 323 (81 N. W. 95), and the case of *Grand Rapids, etc., R. Co.*

v. *Charlevoix Circuit Judge*, 133 Mich. 122 (94 N. W. 1134), corrects the practice; the opinion saying:

"It seems that these cases were overlooked at the time of the decision of *Carpenter* v. *St. Clair Circuit Judge*."

Other similar instances might be mentioned. It is equally true of the other point so clearly covered in *People, ex rel. Russell*, v. *Inspectors, supra*.

In my judgment this should result in a denial of this writ, and the relator should be left to the remedy afforded by chancery. However, in view of an exigency which appeals strongly to my Brethren, and in deference to their view thereof, I have considered the merits of this case.

I am of the opinion that this act, which I consider to be clearly constitutional, has pointed out a way that amendments may be submitted, and that, the council having adopted and voted to submit this amendment, it may be considered as proposed by it, whether we go to the extent of saying that the act points out a practical method of procedure, by petition merely, without any legislative deliberation or action by the council in framing an amendment according to the prayer of the petitioner. That question is set at rest, so far as the submission of the preliminary question of revision is concerned, by the case of *Common Council of City of Jackson* v. *Harrington*, 160 Mich. 550 (125 N. W. 383), and it may be that it should govern in cases of amendment, where no provision is made for a preliminary vote, though possibly a distinction might be made were the question a crucial one in this case. I concur, however, with Mr. Justice BLAIR's conclusion that the charter of the city of Detroit must be revised under the provisions of Act No. 279, Pub. Acts 1909, before amendments can be made in accordance with its provisions. I agree with Mr. Justice BLAIR in regard to the subject of the bonds.

I concur in granting relief, in view of the unexplained action of the court in the *Elliott Case*, and the reliance naturally placed thereon by counsel. The case should be

overruled as out of harmony with the authorities generally, including our own cases.

BIRD, MOORE, BROOKE, and STONE, JJ., concurred with HOOKER, J.

BLAIR, J. This is an application for a review by certiorari of the order of the Wayne circuit court dismissing a petition filed by the attorney general on the relation of taxpayers to restrain the common council of Detroit from submitting to a vote of the electors of that city a proposal to amend its charter. The petition sets out, briefly, the facts, and the answer of the council admits them. A hearing was had upon undisputed facts, and the court below considered the whole matter as involving only a question of law.

The facts, in brief, are these: In March of the present year a petition signed by more than 20 per cent. of the electors of the city was filed with the city clerk, asking for the submission to a vote of the electors at a general or special election of a proposed amendment to the charter, which would give the city the right to own and operate the street railroads. The council, without acting on the matter, transmitted it to the governor, who approved and returned the same. Thereupon the council took into consideration, the matter of calling a special election. Pending such consideration, application for mandamus was filed and argued. After the decision of the lower court, the council called such election for the 15th day of August. Prior to that date this writ of certiorari issued. The application for mandamus was based on three principal grounds, viz. :

(I) Act No. 279 of the Public Acts of 1909, under which, if at all, the proceedings taken can be upheld, is unconstitutional.

(II) The proceedings taken have not been in accordance with said act.

(III) The proposed amendment, if adopted, would be unconstitutional and invalid

I. Counsel for petitioner contend that Act No. 279, Pub. Acts 1909, is unconstitutional for the following reasons:

(1) Bonds are allowed by the statute to be issued which the Constitution does not authorize.

(2) The street railroad mortgage bonds authorized by the statute are debts of the city, and the act fixes no limit to the amount of them, although the Constitution requires the fixing of some limit upon city debts.

(3) The electors are given by the statute no part in framing an amendment when the proceeding is by initiatory petition, although the Constitution confers on them the right to frame amendments.

1. It is argued that the Constitution of 1909 (article 8, § 24) only authorizes for the purpose of acquiring public utilities the issuance of bonds imposing no liability upon the city; that the act under consideration permits for the purpose of acquiring a street railroad the issuance of bonds which do impose liability.

"The Constitution clearly did not intend that cities should have power to issue for street railroad purposes both bonds which impose a general liability and bonds which do not impose such liability. If it be admitted, for the sake of argument, that power is given to issue one kind of bond or the other, power is not given to issue both kinds. It was not intended that a city should, and there is no grant of power to permit a city to, first issue bonds imposing a general liability with which to buy the tracks and equipment of a street railroad system, and, secondly, issue bonds, secured by mortgage, on what it has acquired plus a franchise, on which latter it should not be liable. That, however, is what the act authorizes and what the amendment proposes to have done. By this method the taxpayer is first subjected to a heavy burden in order to acquire the property, and then has his property mortgaged in such a way that in practice, if the venture is unprofitable or ill managed, he must pay again to save his original investment."

In considering this subject we are to keep in mind those general rules of construction referred to by Mr. Justice COOLEY in the *State Tax Law Cases*, 54 Mich., at page 360 (20 N. W. 493).

" And after the repeated declarations by this court that the legislature of Michigan possesses all legislative power, to the full extent that like power is possessed by the parliament, except as State and Federal Constitutions have limited it, we suppose we may consider ourselves safe in assuming that it possesses the power to authorize this proceeding unless something in the State or Federal Constitution forbids. It is that something, then, that should be pointed out to us." *State Tax Law Cases*, 54 Mich. 389 ( 20 N. W. 513 ).

It should also be remembered constantly that "home rule" is the fundamental purpose of the amendments, and that cities can only become financially ruined by accomplishing such ruin themselves.

Sections 23 and 24, Art. 8, of the Constitution of 1909, read as follows:

"SEC. 23. Subject to the provisions of this Constitution, any city or village may acquire, own and operate, either within or without its corporate limits, public utilities for supplying water, light, heat, power and transportation to the municipality and the inhabitants thereof; and may also sell and deliver water, heat, power and light without its corporate limits to an amount not to exceed twenty-five per cent. of that furnished by it within the corporate limits; and may operate transportation lines without the municipality within such limits as may be prescribed by law: *Provided*, that the right to own or operate transportation facilities shall not extend to any city or village of less than twenty-five thousand inhabitants.

"SEC. 24. When a city or village is authorized to acquire or operate any public utility, it may issue mortgage bonds therefor beyond the general limit of bonded indebtedness prescribed by law: *Provided*, that such mortgage bonds issued beyond the general limit of bonded indebtedness prescribed by law shall not impose any liability upon such city or village, but shall be secured only upon the property and revenues of such public utility, including a franchise stating the terms upon which, in case of foreclosure, the purchaser may operate the same, which franchise shall in no case extend for a longer period than twenty years from the date of the sale of such utility and franchise on foreclosure."

There is certainly nothing in these sections expressly prohibiting the issuance of bonds of both kinds, nor is such prohibition necessarily implied.  On the contrary, the sections referred to, upon any reasonable interpretation of the language used, clearly authorize such issuance. It is plain that under the provisions of section 23 any city of the required population may acquire the different utilities referred to, issue its bonds in payment therefor, and incur liability thereunder so long as such liability is not in excess of its debt-contracting power as restricted by the legislature.  Section 24 does not purport to be a restriction upon the power to acquire public utilities under section 23, but an enlargement of such power when necessary by permitting the city to exceed the general limitations of its charter as to bonded indebtedness.  Any other construction would practically prohibit the smaller cities and villages acquiring water and lighting plants, which they might acquire under the Constitution of 1850 by the issue of general bonds, since it is not to be supposed that the money for construction could be obtained upon the security of the utility alone.  If the city may lawfully pay for a public utility entirely by the issue of its general bonds, it logically follows that it may pay for it in part by such bonds and secure the balance by the special bonds authorized by section 24.

Our conclusion seems to be so clearly compelled by the language of the Constitution itself as to require no argument in support of it.  But if any support were needed it is furnished by the debates in the constitutional convention, which make it certain that the members intended to permit the use of both kinds of bonds.  The chairman of the committee on cities and villages, having been asked "whether it would be possible under that clause ever to issue bonds for a public utility that would be a lien upon the entire property of the city or village," replied:  "Up to the amount of the bonded indebtedness, yes, certainly it would," etc.  Proceedings and Debates, vol. 2, p. 837. Delegate Adams, speaking to an amendment for the pur-

pose of limiting the bonds to the nonliability kind, said in part:

"As the language reads here, I can see nothing to prevent the city bonding its faith, property, and credit up to the limit of its bonded rights and taking that amount and making a first payment upon the purchase price of a street railroad system, then bonding the street railway system for the balance of the purchase price." *Id.* p. 838.

Delegate Pratt, speaking on the same subject, said:

"Mr. Chairman: There was one other reason that influenced the committee in leaving the proposal in the shape in which it was reported out, and that was the point made, I think principally by the gentleman from Macomb (Mr. Acker), that there were a great many small cities and villages that could not, with only the mortgage bonds available for use, raise money for water and lighting plants, and we thought that those small communities ought to have the source of raising money by ordinary municipal bonds open to them for those purposes." *Id.* p. 844.

In the course of the debate, Mr. Adams offered the following substitute:

"Mr. Chairman: I desire to offer as a substitute for the amendment offered by the gentleman from South Haven, and also to cover the entire language of clause 13, the following:

" 'When a city or village is authorized to acquire or operate a public utility for supplying transportation, it may issue mortgage bonds therefor,' etc.

"Then comes clause 14:

" 'Provided that such mortgage bonds shall not impose any liability upon such city or village.'

"And when we reach clause 14 I want to follow this up by moving to strike out the words 'issued beyond the ordinary limit of its bonded indebtedness,' in order to make the clause read correctly." *Id.* p. 845.

Speaking on the substitute, Mr. Fairlie said:

"Mr. Chairman: I wish to indorse what has has been said by Mr. Simons and Mr. Pratt. This section, like

the rest of the proposal, is the result of a great deal of discussion in the committee on cities and villages, and I believe in its present form it presents substantially the best arrangement that can be made. The amendment proposed by Mr. Adams restricts the use of mortgage bonds to purely transportation questions. Now, it is true that it is that problem which has raised the question of such mortgage bonds; but I believe it to be the opinion of most of the members of the committee on cities and villages that the use of such bonds should not be restricted. We believed that for water and lighting plants it was advisable to permit the city to issue bonds on the general credit of the city, and it was also advisable that the city should have the alternative of issuing mortgage bonds secured only by the plant itself. Mr. Adams' motion makes that alternative impossible. The new substitute by Mr. Wicksall does not go so far, and for that reason is not so objectionable. But I still believe that the proposal in the form presented by the committee is in its best form, and I therefore hope that both the amendment and the substitute will be defeated." *Id.* p. 845.

Mr. Adams, in support of his substitute, said:

" Mr. Chairman: If the language of the printed report before us only permitted cities to mortgage the property purchased in establishing a utility for transportation purposes, then I would have nothing more to say. But I cannot indorse the idea of permitting a city to pledge its faith, its general faith and credit, and all the property it possesses, for any part of the purchase price of a transportation line. I think that is against public policy and dead wrong. And for that reason I cannot stand for the language that appears in this report. If it can be changed in any way to conform to my amendment covering that point, so that in establishing transportation lines they should only mortgage property of those lines, that will be all right."

The substitute and amendments and all subsequent substitutes and amendments to the same end were voted down by the convention. In explaining his vote in the negative upon the final passage of the sections, Mr. Adams assigned as his fourth ground:

"Because this grants the power to a city to bond its

general faith and credit for the purchase of a public utility; and on top of that bonding the special property for the balance of the purchase price." *Id.* p. 1156.

We therefore consider it to be established beyond cavil that the convention intended to permit the use of both kinds of bonds, and that they used apt and appropriate words to express that intention.

Under sections 20 and 23 the legislature is authorized to provide for an issue of bonds to the limit restricting the cities' borrowing power. Under section 24 the legislature is authorized to provide for an issue of mortgage bonds beyond the general limit of bonded indebtedness. This is precisely what it has done, and, to nullify its action directly supported by the constitutional provisions, we must import into the Constitution restrictions unwarranted by its language.

2. No limit is fixed by the act to the amount of the nonliability mortgage bonds. These bonds, where general bonds have been issued, are debts of the city, and the indebtedness of the city may be increased without limit, although section 20 expressly requires such limitation.

The important question raised by this contention is whether the nonliability bonds in reality constitute an indebtedness on the part of the city, within the meaning of the Constitution, so as to require limitation under the provisions of section 20. The language of section 24 is at war with any such construction. That section expressly provides that the limit of general bonded indebtedness required by section 20 shall not apply to the bonds authorized, so long as the bonds themselves impose no liability upon the city and are in the form substantially prescribed. The Constitution contained no such provision when the case of *Ironwood Waterworks Co.* v. *City of Ironwood*, 99 Mich. 454 (58 N. W. 371), was decided. The Constitution clearly implies that there is to be but one "general limit of bonded indebtedness prescribed by law," and that the bonds provided for in section 24 are not to be considered in determining whether such limit has been exceeded.

*Austin* v. *City of Seattle,* 2 Wash. St. 667 (27 Pac. 557);
*Woodbridge* v. *City of Duluth,* 57 Minn. 256 (59 N. W.
296).   The legislature, in pursuance of the constitutional
provision, has, in the statute under consideration, fixed
the general limit of bonded indebtedness and has ex-
pressly provided:

"That no city shall have power to borrow money or
issue bonds imposing any liability upon the city in the
purchase, construction or maintenance of a public utility
for transportation purposes, which liability added to the
then existing general indebtedness of the city shall cause
the net general indebtedness of the city to exceed four
per centum of the assessed value of all the real and per-
sonal property of the city."

In the same section is found a provision for the issuance
of nonliability bonds in the exact language of section 24
of article 8.   It would appear, therefore, that, even if the
so-called nonliability bonds do become a debt of the city,
then the amount thereof is clearly limited by the provision
quoted.   If they do not create any indebtedness on the
part of the city, within the meaning of section 20, the
constitutional provision has not been violated.

3. The electors are not given any part in framing an
amendment.

In the recent case of *Common Council of City of Jack-
son* v. *Harrington,* 160 Mich. 550 (125 N. W. 383), we
said of sections 20 and 21 of article 8:

" It is to be noticed that the foregoing provisions of the
Constitution are mandatory, and it is obvious that Acts
Nos. 278 and 279, the first relating to villages, and the
second to cities, were passed by the legislature of 1909 for
the express purpose of carrying out the constitutional
mandate.   We are left in no doubt, therefore, as to the
legislative intent.   It intended to, and did, pass a general
law, giving to the electors of cities power to frame, adopt,
and amend charters."

Section 21 provides that—

"Under such general laws, the electors of each city

and village shall have power and authority to frame, adopt and amend its charter," etc.

Under this provision, such cases as *Elliott* v. *City of Detroit*, 121 Mich. 611 (84 N. W. 820), cease to apply, since the people in their sovereign capacity, through the Constitution, have not only authorized but commanded that power to amend a charter be delegated to the electors of the city. The Constitution does not purport to point out the method by which this important power, now for the first time conferred upon the electors, shall be exercised, but leaves the details entirely to the legislature. There is nothing in the language of the provision to indicate that it was contemplated that the whole body of the electors in a city like Detroit should convene for the purpose of framing an amendment, as a strict construction of the language might require. Since it would be impracticable for all of the electors to meet and frame an amendment or to determine upon what subject they wished to have one framed, some indirect means must be adopted, and that adopted by the legislature as well satisfies the Constitution as to provide for the election of a. committee of electors to frame the amendment. For the framing of the amendment proposed by the committee would have no binding force, since the body of the electors in whom the power resides could not delegate its power to frame any more than it could delegate its power to adopt, if such power is an essential element of the constitutional power granted.

We are of the opinion that the method of presenting a proposed amendment provided for is within the power necessarily committed to the legislature to provide the method of executing the constitutional provision as fully as the power to prescribe the method of proposing a revision of a charter, which we held to be constitutional in *Jackson Common Council* v. *Harrington, supra.*

II. The proceedings are not in conformity with Act No. 279,

The contentions are:

(1) That revision must precede amendment under the act.

(2) That the act presupposes action by the council before submission to the governor of the petition.

1. The act contemplates and provides for:   (*a*) The incorporation of new cities; (*b*) a general revision of the charters of existing cities; (*c*) the amendment of the charters of existing cities; (*d*) the continued existence of existing cities with all their "present rights and powers until otherwise provided by law."

Section 20 of article 8 of the Constitution requires " a general law for the incorporation of cities," etc.   Section 21 provides that:

"Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter, and, through its regularly constituted authority, to pass all laws and ordinances relating to its municipal concerns, subject to the Constitution and general laws of this State."

We have held that the title of Act No. 279, Pub. Acts 1909, is broad enough to include the revision of existing charters. *Common Council* v. *Harrington, supra.* It is, of course, apparent that any city incorporating under Act No. 279 must include in its charter the compulsory provisions of section 3 of the act and the restrictive provisions of section 5.   At every election on the question of incorporating a new city, the electors also are entitled to vote for nine electors to constitute a charter commission who "shall convene within ten days after election and frame a charter for said city."   Act No. 279, Pub. Acts 1909, § 15.   In case of cities desiring a general revision of their existing charters under section 18 of the act, a charter commission is also provided for to frame the revised charter for submission to the electors, and we cannot doubt that it was the intention of the legislature to require that such revised charter should also contain the compulsory and restrictive provisions referred to.

Does a different rule obtain with reference to amend-

ments provided for in section 21 *et seq.?* If we must answer this question in the affirmative, the result will be that a city by extensive amendments may effect a general revision of its charter containing none of the restrictive provisions of section 5 and prohibiting the doing of any of the things commanded by section 3. The language of section 21 of article 8 of the Constitution is not without significance in this connection. Authority "to frame, adopt and amend its charter" naturally refers the authorized amendment to a charter framed and adopted "under such general laws." This, we think, was the view of the legislature, as manifested by the terms of the act. At the very outset of the act it is provided:

"SEC. 2. Each city now existing shall continue with all its present rights and powers until otherwise provided by law."

"Until otherwise provided by law" can scarcely be said to refer to subsequent sections of the act itself, but must be held to refer to some future law. The provisions of section 21, therefore, that "an amendment to a charter may be proposed by the legislative body," etc., refer, in our opinion, to the new charter or general revision equivalent thereto framed and adopted under the previous provisions of the act. This construction is in harmony with the letter and spirit of the Constitution to provide a municipal constitution for all cities, in conformity with the fundamental principles of which and the Constitution and general laws of the State each city may govern itself according to the judgment of its electorate. The contrary construction of piecemeal amendment would be out of harmony with the scheme of home rule proposed by the Constitution and the statute and would make the confusion intended to be remedied by "general laws" worse confounded.

We therefore hold that, since revision must precede amendment, the proceedings have not been taken in accordance with the act. In view of this conclusion, it becomes unnecessary to consider the other points.

No question was raised, either in the court below or in this court, as to the propriety of the remedy by mandamus; counsel and the circuit bench doubtless considering the question settled by the case of *Elliott* v. *City of Detroit,* 121 Mich. 611 (84 N. W. 820). At the request of this court, briefs have been filed by counsel for the respective parties, which briefs concur in the view that mandamus is the proper remedy. Undoubtedly, the general rule is that the function of mandamus is to compel action, and not to restrain action. Nevertheless, this court, in the *Elliott Case,* above referred to, affirmed the order of the circuit bench issuing a writ of mandamus commanding the city of Detroit to desist and refrain from proceeding further to publish certain notices, etc., relative to the holding of an election. It was contended "that the court has no jurisdiction in the matter by way of mandamus, that mandamus is not the proper remedy," etc. The question was, therefore, squarely presented to this court, whether mandamus was the proper remedy to restrain action by the city, and whether the circuit court had any jurisdiction by way of mandamus to restrain the contemplated action. The case is on all fours with the instant case as to the facts, the character of the legal questions involved, and the necessity of prompt action. Unless, therefore, we are to overrule the case, it determines this as to the question of remedy. I am in favor of confining the application of the *Elliott Case* to precisely similar cases where there exists a public exigency and constitutional questions are involved; but I am decidedly opposed to overruling it. In my opinion, it is a wholesome rule, as applied to a case like the present, which affects the constitutionality of the general statute for the incorporation of the cities of the State, under which many municipalities have taken, are taking, or are about taking, action.

The order denying the writ is overruled, and the writ granted.

OSTRANDER, C. J., and MCALVAY, J., concurred with BLAIR, J.