488     SUPREME COURT OF WISCONSIN.     [May

State ex rel. Mueller v. Thompson, 149 Wis. 488.

STATE EX REL. MUELLER, Respondent, vs. THOMPSON, City
Clerk, Appellant.

*April 8—May 14, 1912.*

*Constitutional law: Powers of legislature: Granting and amending*
*municipal charters: Delegation of power: "Home rule" act.*

1. The fundamental law embodies those principles, some in form of
   declaration, others by way of implied or express prohibition,
   and some in the form of grant, supposed to be limitations es-
   sential to conserve human liberty, security, equality, and hap-
   piness, and not to be subject to change except in a way calcu-
   lated to arouse the highest judgment and most efficient delib-
   erate considerate choice.
2. Each of the three distinct departments of government,—execu-
   tive, legislative, and judicial,—is supreme in its sphere; out-
   side thereof is usurpatious, and that of the judiciary includes
   power to dominate, efficiently, as regards marking the precise
   boundaries of each and remedying invasions by either of the
   territory of the other.
3. The sole power to make law is lodged in the legislature with
   competency, however, to exercise it, by adopting an enactment,
   complete in itself, and prescribing the conditions under which
   it shall be vitalized, as by a vote of the people at large or those
   of a particular district, according to circumstances.
4. The power to grant municipal charters is an attribute of sov-
   ereignty, exercisable, anciently, solely by the personal sover-
   eign, then by his legislative body by his consent. Here the
   people succeeded to that prerogative power and, by the funda-
   mental law, made the legislature the repository thereof.
5. The power to make, change, or repeal municipal charters was
   legislative in character by the common law in force when the
   state was admitted into the Union and so expressly retained
   by sec. 13, art. XIV, in the general retention of our common-
   law system, as a whole, to remain in force till changed by the
   legislature in the constitutional way.
6. Power of the legislature to change the common law, in force in
   this state when the constitution was adopted, is limited, re-
   specting municipal charters, by sec. 1, art. XI, which, in form,
   grants thereto power to form municipal corporations, which, by
   necessary implication, includes power to grant municipal char-

ters, fixing all fundamentals with reference to the special city government and prohibits exercise of such power otherwise, under the rule *Expressio unius exclusio alterius.*

7. Sec. 32, art. IV, of the constitution commanding legislative provision for the transaction of any business, the doing of which by special legislation is prohibited by sec. 31 of such article, contemplates a legislative effort, in general, such as by the enactment of a law to be passive until made active by a vote of the people of any district authorized to act on the question,— not delegation of power to the people at large or of districts, or a district, according to circumstances, to do the business.

8. The idea embodied in sec. 31, art. IV, of the constitution, as to city charters, is that they shall be uniform throughout the state, as near as practicable, which would be violated by affording cities capacity to create want of uniformity by the exercise of authority, in severalty, to make, change, and repeal their charters.

9. The power, in form, delegated by ch. 476, Laws of 1911, by the language, "Every city, in addition to the power now possessed, is hereby given authority to alter or amend its charter, or to adopt a new charter," is such dominating feature thereof as to render all others subsidiary thereto and dependable thereon.

10. The power so, in form, delegated is one which was within the exclusive legislative field before the constitution and confined thereto thereby.

11. The ruling feature of ch. 476, Laws of 1911, being unconstitutional, the others, forming an inseparable whole, take the cast thereof and fall therewith as invalid.

[Syllabus by MARSHALL, J.]

APPEAL from an order of the circuit court for Milwaukee county: W. J. TURNER, Circuit Judge. *Reversed.*

*Mandamus* proceeding to coerce the clerk of the city of Milwaukee to submit to its electors, under ch. 476, Laws of 1911, a proposed alteration of the city charter. The purpose of such alteration was to allow the city to conduct the business of furnishing its citizens with ice.

All conditions precedent in the law to calling a special election in respect to the matter of the proposed change were satisfied, but the clerk refused to make the call. Whereupon an alternative writ of *mandamus* was sued out to coerce him to

do so.  Such proceedings were thereafter had that appellant moved the court to quash such writ, which was overruled. This appeal followed to test the validity of such law.

*Daniel W. Hoan,* for the appellant.

For the state there was a brief by the *Attorney General* and *Russell Jackson,* deputy attorney general, and oral argument by *Mr. Jackson.*

For the relator and respondent there was a brief by *Nohl & Nohl,* and oral argument by *Leo F. Nohl.*

On behalf of the respondent there was also a brief by *Erich C. Stern, amicus curiæ,* and *Williams & Stern,* of counsel, and oral argument by *Erich C. Stern.*

A brief was also filed by *F. C. Winkler* on the validity and scope of ch. 476, Laws of 1911.

MARSHALL, J.  As indicated in the foregoing, the motion raised the issue of whether ch. 476, Laws of 1911, commonly called the "Home Rule" act, is constitutional. The trial court decided in the affirmative.

When our state government was formed, the people adopted for the paramount law, a declaration of principles modeled after the prevailing constitutions in this country. It was intended to be exact in its limitations of power, not to be open to change except in such particular and deliberate way as to render as certain as practicable that the electors desired it, evidenced by an expression of judgment after ample time and facility for investigation and maturity of thought on the subject, not to be subject to violation at all, and to create an instrumentality,—a court,—to efficiently guard it in that respect.  One might exhaust his capability of using the great resources of our language in portraying the necessity for such a foundation for a people's government to rest upon,—in picturing the dignity which should be accorded to it by every department of affairs and by the people in their individual capacities, and yet leave the matter incomplete.  One might

do likewise as to the particular duty resting here to hold up the constitution safely above every act of lawmaking power which would otherwise violate it, without exaggerating the importance to the people of its faithful performance. Such performance is a judicial function, overshadowing in its significance. That it is sometimes viewed with impatience by those called to face constitutional restraints, cannot have any weight whatever as to whether the duty should be performed or not. History shows, to the great credit of average intelligent comprehension of our system of government, that firm, conservative judicial administration in the field of testing legislative enactments by the constitution, is quite sure to be approved, in general, by the deliberate judgment of the people. In no field have the people, under our form of government, won more distinction than in loyalty, in the ultimate, to their courts.

In our constitutional scheme there are three co-ordinate, substantially independent branches, namely, executive, legislative, and judicial. Each, so long as operating within its legitimate field, is supreme. It is for the court, in the ultimate, to determine whether the boundaries of a particular field have been overstepped and, if so, to nullify or stay the transgression.

The power to make law, commonly called legislative power, is dealt with by sec. 1, art. IV, of the constitution in these words: "The legislative power shall be vested in a senate and assembly." In thus limiting power to make law to the representative bodies the people, by necessary implication, parted with authority to do so directly; as the court has held, though not to determine by legislative permission whether a law, enacted in the constitutional way, shall be put into operation. *State ex rel. Boycott v. Mayor, etc.* 107 Wis. 654, 84 N. W. 242; *State ex rel. Van Alstine v. Frear,* 142 Wis. 320, 125 N. W. 961.

So, it is plain that, power to make law,—to exercise the

function contemplated by that part of the constitution under consideration,—was reserved exclusively to the legislature, and any attempt to abdicate it in any particular field, though valid in form, must, necessarily, be held void. Just what falls within the scope of this power is not always easy to determine; but, as to a particular subject plainly recognized by the constitution as within such field, there is no room for doubt. Such is the case as to granting corporate charters to cities, as we shall see.

Sec. 1, art. XI, of the constitution vests in the legislature power to form municipal corporations by either general or special laws. Sec. 3 of such article provides that "it shall be the duty of the legislature, and they are hereby empowered, to provide for the organization of cities . . . and to restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessments and taxation, and in contracting debts by such municipal corporations."

Those provisions have always been treated, and unavoidably so, as embodying the fundamental law as regards the granting of corporate charters to cities. Such a municipal corporation can only be created by a legislative act; that is by legislative charter, determining its form of government and its powers. No attempt has ever, before the act in question, been made to grant or change a municipal corporate charter, except by general or special act of the legislature, particularly .covering the subject. Such has been a feature of civil government from time immemorial. Such charters, anciently, emanated from the crown as a prerogative function and went into force by consent of the community afforded the grant. Later such grants were made by legislative power by sovereign permission and went into operation with or without the assent of the community affected according to legislative purpose. The later method became, by adoption, a part of the common law

of this country,—the prerogative power in the matter being regarded as vested in the people's representatives. At the time of the adoption of our constitution there was no way of forming a city corporation, except by act of the legislature, specifying its form of government and powers. That was entrenched in the fundamental law by sec. 13, art. XIV, providing that "such parts of the common law as are now in force in the territory of Wisconsin, not inconsistent with this constitution, shall be and continue part of the law of this state until altered or suspended by the legislature."

Thus it will be seen power to grant corporate charters for cities, to change and repeal the same, was a legislative function at common law, and made exclusively such by our constitution. While power, in general, was reserved to the legislature to change the common law it was withheld in case of reservation to the legislature of exclusive authority in a particular field, as that of granting, amending, and repealing municipal charters.

In view of the foregoing, very little need be said in testing the act in question by constitutional restrictions. As we have seen, determination of the form of government and everything appertaining to the fundamentals of a city charter are essentially legislative functions. Power in that respect was so universally regarded before the constitution and thereby the legislature was disabled from delegating it. Can one read the act under consideration and doubt that, in terms and effect, it involves an attempt at legislative abdication of that power, to a large extent? In answering that we need look but to the first section, which we quote. All which follows is subsidiary thereto and must, necessarily, fall if the substructure cannot stand the constitutional test.

"Every city, in addition to the powers now possessed, is hereby given authority to alter or amend its charter, or to adopt a new charter by convention, in the manner provided in

this act, and for that purpose is hereby granted and declared to have all powers in relation to the form of its government, and to the conduct of its municipal affairs not in contravention of or withheld by the constitution or laws, operative generally throughout the state."

Note the two distinct grants of power: first, to alter or amend an existing charter or adopt an entirely new one; second, to exercise all powers in relation to the form of government and conduct of municipal affairs not conflicting with the fundamental or any general law. The second is subsidiary to and in aid of the first and a limitation thereof in some respects. The first is broad, with unmistakable purpose to enable any city in this state to make its organic law to suit the pleasure of its people,—to change its existing charter or make a new one without any legislative interference. The second is in the nature of a proviso to the first; that as to the mere form of government and the conduct of municipal business, the exercise of the latter shall be within the designated limitations, leaving the fundamentals of the charter, in general, to local discretion.

It seems plain that, by the first clause of the section, there is indicated, with great clearness, a purpose to delegate power to make law of the nature which was clearly reserved to the legislature, and that in the means attempted to be afforded in aid thereof, there is likewise a manifest purpose to delegate authority which the constitution so reserved. The form of a city government is of vital importance,—the very foundation stone of the creation.

It is not intended to suggest that there was any intent on the part of those responsible for placing the enactment on the statute book to violate the constitution. It is one thing to misconceive or fail to appreciate constitutional limitations, and quite another to intentionally act in violation thereof. One may do the former in the utmost of good faith and intended fidelity to his oath of office. Unconstitutional enact-

ments have occurred from time to time, attributable to the former cause, but rarely, if ever, rightly attributable to the latter. So it happens, as we venture to say, that the good faith, characterizing a legislative enactment such as we have under consideration, which it is our duty and pleasure to accord to a co-ordinate branch of the state government, in general, invites, as it were, and approves careful, firm performance of duty here to test such enactments by constitutional safeguards and guarantees willing submission to the result. It is only through such deference by each co-ordinate branch of our system to the other, and submission to and commendation of conscientious, firm, full performance of duty, that the people may enjoy the blessings intended to be secured by our constitutional system.

The only room, it seems, there could be, as an original matter, for fair doubt as to the illegitimacy of a delegation of power to create, amend, or repeal corporate charters, is in the fact that, accompanying sec. 31, art. IV, of the constitution,—adopted in 1871, except the ninth subdivision relating to towns, cities, and villages added in 1891, prohibiting the incorporation of any city, town, or village or amending the charter thereof by special laws,—sec. 32 of such article was adopted declaring that "The legislature shall provide general laws for the transaction of any business" within the prohibition of "section thirty-one," such laws to "be uniform in their operation throughout the state." Whether it was intended thereby to authorize the legislature, by a general law, to delegate the power theretofore exercised by the legislature in regard to granting corporate charters by special act to some local body or the people themselves; or whether the intent was that the constitutional mandate should be exercised by the legislature making a law complete in itself forming the whole or part of a general charter system and leaving it with the community desiring to be a city corporation to adopt the general charter law and with an existing city to adopt it or any com-

plete part thereof in place of its charter or portion of it,—
was a subject for thought in *State ex rel. Boycott v. Mayor,
etc.* 107 Wis. 654, 84 N. W. 232.   The conclusion was that
the change in the constitution did not take the function of
making the fundamental law for cities from the legislature, or
give authority to delegate it; that "transaction of any busi-
ness" prohibited, within the meaning of the language used,
goes no further than some method of adopting a law formu-
lated and enacted by the legislature.    The idea that the
amendment contemplated delegating authority to do the busi-
ness in the sense of making the law itself, was, by necessary
implication at least, repudiated.   The court said, in effect,
that any exercise of power in the matter by an existing mu-
nicipal corporation further removed from direct legislative
interference than by adopting a corporate charter or a com-
plete sub-part thereof covering a subject, as formulated by the
lawmaking power, would be legislation by the corporation and
not by the legislature, and so inhibited by the constitution.

True, the precise question here was not discussed or treated
in the opinion of the court in the case mentioned; but the
plain logic of the decision is that a legislative delegation of
authority to make a city charter, or any part of it,—a power
other than to adopt a legislative creation,—would be a delega-
tion of legislative power and so void.   The writer deemed a
contrary view, at least as to special city charters, of sufficient
merit to warrant discussing it at length to aid in reserving the
question for future consideration in case of a situation being
presented in which it might be vital.   The case then in hand
was not thought to be such.   In the years which have since
elapsed the writer has come to the conclusion that the logic of
the court's decision, carried to its fullest extent, is right.   So
while, if the question were open as to whether the legislature
can properly delegate power to make or change a city charter,
in the sense of determining the form of government and the
fundamentals, in short, except by the option law method, it

would have to be answered in the negative, it should be regarded as thus ruled by *State ex rel. Boycott v. Mayor, etc., supra,* and subsequent cases.

The foregoing is reinforced by the plain intent of the constitution that city charters shall be uniform, throughout the state, as nearly as practicable.    Before subd. 9 of sec. 31, art. IV, was adopted the general charter law was enacted. The scheme of it was to classify existing cities for general legislation and to afford opportunity, without legislative interference, to adopt an entire charter, or any portion thereof covering any particular subject, in place of an existing special charter or portion thereof.    The general law and the new subdivision of sec. 31, art. IV, were companion laws to effect uniformity in city charters.    The enactment in question is plainly in violation thereof.    Under it facilities for changes in city charters, in number, character, and frequency, regardless of uniformity, would be immeasurably greater than under the system prior to 1891.

We thus reach a very satisfactory conclusion that the law in question is unconstitutional and so did not impose any duty upon appellant to perform that which he refused to do.    We have reached that conclusion from the plain purpose of the several constitutional provisions referred to, and the likewise plain violation thereof which the enactment in question, if sustained, would accomplish.    We have not found it necessary or advisable to go outside of the very narrow field indicated in order to obtain aids in reaching such conclusion, or illustrations to support its correctness.    That will explain why no reference had been made to many features of the arguments of counsel who favored the court with the results of their efforts to assist.

It is correctly claimed on the one side, and not effectually, if at all, denied upon the other, that in most cases where legislation of the nature of that in question has been adopted it was preceded by a constitutional amendment expressly author-

izing it, while in those not so preceded the legislation was con-
demned as unconstitutional.    The most striking instance of
that is found in *Elliott v. Detroit,* 121 Mich. 611, 84 N. W.
820.    The court's disapproval of such attempted delegation
of authority as we have here was expressed very emphatically
and without qualification.    Such an enactment, as there in-
dicated, has no support whatever in the competency of the
legislature to delegate limited powers of local legislation of
an administrative character, to cities.    All such regulations
are, in a broad sense, within the fundamental lines of the leg-
islative charter.    The difficulty here is in the attempted dele-
gation of power to make, change, or repeal the charter itself.
The distinction between such a power and authority uni-
versally exercised by cities before the constitution and pre-
served under it,—to enact by-laws or ordinances in the admin-
istration of specific charter powers, is quite marked and com-
monly understood.

The result of the foregoing is that the order appealed from
must be reversed, and the cause remanded with directions to
sustain the motion to quash the alternative writ and to dismiss
the *mandamus* action with costs.

*By the Court.*—So ordered.

TIMLIN, J. (*concurring*).    The order does not prevent a
judgment from which an appeal might be taken nor is it the
final order in a special proceeding, but it may, I think, be con-
sidered an order overruling a demurrer.    Sec. 3069, Stats.
(1898); *State ex rel. Neeves v. Wood Co.* 41 Wis. 28; *Flan-
nigan v. Lindgren,* 122 Wis. 445, 100 N. W. 818.    Attempt-
ing to act under ch. 476, Laws of 1911, the common council
of the city of Milwaukee, by a two-thirds vote of its members,
adopted a resolution that:

"The charter of the city of Milwaukee is hereby altered
and amended by adding to ch. 4 thereof a new subdivision
which shall read:

"Sec. 1. The city of Milwaukee is hereby authorized and empowered to establish, maintain, and operate a plant for the manufacture, purchase, and sale of ice and the distribution thereof to its citizens under such terms and pursuant to such regulations as may be prescribed by the common council of said city.    The common council of said city is hereby authorized to prescribe such terms and to formulate and adopt such regulations concerning the manufacture, purchase, and sale of ice and the distribution thereof to its citizens as it may deem just and proper.

"Sec. 2. The said city of Milwaukee is hereby authorized and empowered to acquire by gift, grant, or purchase for the purposes aforesaid, suitable lands, buildings, machinery, and equipment to operate and maintain an ice plant and for the keeping, transportation, and distribution of ice under such terms and pursuant to such regulations as may be adopted by the said common council.

"Sec. 3. The said common council is hereby authorized to raise and provide all necessary money and other means for all the purposes aforesaid.    Such purpose is declared to be a public purpose.

"Sec. 4. All provisions of the charter and ordinances of the said city of Milwaukee conflicting herewith are hereby modified and repealed so as to give full force and effect hereto."

Ch. 476, Laws of 1911, as amended and corrected by sec. 95, ch. 664, Laws of 1911, is a statute which attempts to put in force that condition of city government popularly and vaguely described as "home rule."    This subject of home rule for cities is new in Wisconsin.    Statutes on the subject have been enacted in Louisiana and Michigan in advance of any amendment to their state constitutions, and several state constitutions have been amended for the purpose of enabling the legislature to confer this power upon cities.    Among the states which have adopted such constitutional amendments are California, Michigan, Minnesota, Missouri, Oklahoma, Oregon, and Washington.    The reasons urged by the advocates of this plan of city government are: (1) that it will obviate the evil of unwise legislative intermeddling with the local affairs of

cities; (2) that it will foster and develop among the electors of the city a sense of responsibility and a knowledge of local municipal affairs; and (3) that such electors have a better knowledge than legislators selected from the entire state concerning local affairs and local conveniences or necessities.

About twenty years ago in this state it was thought the legislature interfered too frequently by special laws in the government of cities, and the state constitution was amended so as to forbid the legislature to enact any special or private law for incorporating a city or to amend its charter. The legislature was thus powerless to act in such matters except by general legislation. But such classification of cities was of necessity and by decisions of this court permitted that there was, with reference to the largest city in the state, about the same freedom of legislation as formerly. The acts of the legislature merely took the form of general legislation for a class of cities. It is said that in Minnesota a like constitutional restriction upon the enactment of special laws produced an opposite result. *State ex rel. Getchell v. O'Connor,* 81 Minn. 79, 84, 83 N. W. 498. But too little legislative power in Minnesota and too much in Wisconsin alike begot a desire for "home rule." Thus either too little or too much legislative power in this respect would appear to be inconvenient or undesirable, as certain disorders of the stomach may be caused either by surfeit or by famine. Much crude and ill-digested information on this subject is printed and published by advocates and antagonists more enthusiastic than thoughtful, and considerable pseudo-scientific exposition of the subject may be found in pamphlets, addresses, and books.

We must expect to have many new theories of government and some experiments made in a country which attempts to give a partial education to all its citizens and in which practically unlimited suffrage prevails and whose people are active, alert, and progressive. The theories advanced may have been investigated and rejected or even experimented with and

rejected centuries ago, but they are new to most of the electors, and the enthusiastic propagandist obtains an audience and a following. This is very irritating to the citizen who is disposed to sleep at his post of citizenship; to the citizen whose profits are threatened thereby; and to the citizen who reveres old things merely because they are old. Hence the ever-recurring and irrepressible conflict. But those can look on, impartial and entertained, who know that in all things, old and new, good and evil are combined; that the law of this world is struggle, and that balance is preserved only by action of opposing forces; that no legal rule or institution exists without having had at its origin a cause for its existence; that if that cause has passed away the institution cannot be upheld; and that if that cause still exists it will bend and warp all innovation to harmonize with it and vindicate itself through the same force that brought the ancient rule into being in the first instance.

It is obvious and elementary that there can be but one sovereign power in the government of a state. As well might we speak of two centers in a circle as two sovereign powers in a state. Sovereignty, however, may be so divided or distributed that several officers or departments of government must each act in its full exercise. This division of power is at the basis of the check-and-balance theory of government. It is essential to liberty, and it obtains with modifications in detail in all enlightened governments. Or sovereignty may be otherwise divided so that there is a dual government, each supreme in the same territory, but in certain separable and specified matters, and of this the mediæval governments, where the church was sovereign in ecclesiastical and the state in secular matters, constitute examples. Or sovereign power may be divided with reference to the matters to be acted upon so that there are two sovereigns in the same territory, but each over different matters, and in each of these sovereignties there may exist the division or distribution of sovereign power into sepa-

rate departments which must all join in its full exercise. And
of this, most federal forms, like that of the states and the
United States, Canada, and to some extent Germany, consti-
tute examples. Where sovereign power is distributed among
officers or departments there may be some encroachment of
one department upon another or there may result an *impasse;*
action is slow, efficiency is not great, but there is liberty.
Where the division of power is with reference to subjects of
regulation, a clash is inevitable unless there is some authority
or overlord empowered to determine what matters belong un-
der the jurisdiction of each sovereign, because it is impossible
to specify in advance the unknown or unforeseen. That gov-
ernment possessing this power is the real sovereign. Two op-
posing theories of the origin of this sovereign power prevail
and appear in written constitutions. One is that the full
sovereign power was originally vested in an autocrat, and he
has granted to the people a constitution but still retains all
sovereign power not thus granted. This is the theory of the
constitutions of Prussia and, I think, of most of the other
states of Germany, and its result with reference to cities which
are not states is that the administrative department of the
government, which is a branch of the executive, interferes
with the local government of cities promptly and efficiently
by disapproval of their choice of city officers and veto upon
their exercise of any power not granted away by the autocrat
when he gave his people the constitution or given by anterior
executive grant to the city or long user presupposing a grant.
The other theory is that sovereign power resides in the people,
who form their own constitutions, limiting, as therein provided
and to a greater or less extent, the power of all their officers
and their own power to change the constitution except in the
manner provided therein. All persons and institutions in a
state of this kind are subject to laws made conformably to the
constitution, and the consequence is that under such condi-
tions the legislature, representing the people, has the power

State ex rel. Mueller v. Thompson, 149 Wis. 488.

to interfere in the government of cities as the executive may in Prussia and other German states. To some this executive interference by one autocrat seems infinitely better than legislative interference by the majority voice of 133 autocrats; but I think it will be found that the basic difference between municipal government in Europe and that in this country rests upon the fact that here the man who pays no taxes and he who would be considered in continental Europe a temporary sojourner or a transient is permitted to vote and so indirectly control the fiscal affairs of the municipality, while there such persons are not electors of the city and have no voice in such affairs. There, also, the law frequently prescribes necessary qualifications or conditions of eligibility to city offices; here there is no such thing. There may exist a city-state possessing many of the powers of sovereignty, and that state may have its local government include a small adjoining rural area and be a member of a confederacy with other states and represented in the federal or national congress, like Lubeck, Bremen, and Hamburg in the German federation. Or the city may be the sole and absolute sovereign within its boundaries and over its dependencies like the old city-states of Rome, Carthage, or Venice. But neither of these forms of city government is possible in this country under our national and state organizations. Here a city is only possible as an administrative agency of the state, having a measure of local legislative or ordinance power and a limited proprietary capacity. There is no instance, I think, in history where such civil divisions have been authorized to exercise absolute home rule except that of the communal law of France of 1789, which was attended with disastrous results. All laws relating to the autonomous government of cities in this country, in order to be valid, must fit into our fundamental conditions of government, and in order to be successful must not only be valid but also appropriate to sociological and political conditions existing here, not to those existing elsewhere, and they

must respond to our changing conditions and to constitutional rights of the citizens affected thereby.

In *Straw v. Harris,* 54 Oreg. 424, 103 Pac. 777, the court considered sec. 2, art. XI, of the constitution of Oregon as amended in 1906. That reads as follows:

"Sec. 2. Corporations may be formed under general laws, but shall not be created by legislative assembly by special laws. The legislative assembly shall not enact, amend, or repeal any charter or act of incorporation for any municipality, city, or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of the state of Oregon."

This seems to exclude all state laws except the criminal laws. The court said:

"The language used in the amendments considered would appear to give incorporated cities the exclusive control and management of their own affairs, even to the extent, if desired, of legislating within their borders without limit, to the exclusion of the state. But, as stated, these provisions must be construed in connection with others of our fundamental laws, which can but lead to the conclusion above announced; and whatever may be the literal import of the amendments it cannot be held that the state has surrendered its sovereignty to the municipalities to the extent that it must be deemed to have perpetually lost control over them. This no state can do. The logical sequence of a judicial interpretation to such effect would amount to a recognition of a state's independent right of dissolution. It would but lead to sovereigntial suicide. It would result in the creation of states within the state, and eventually in the surrender of all state sovereignty—all of which is expressly inhibited by art. IV, sec. 3, of our national constitution. Power to enact local legislation may be delegated, but this of necessity, whether stated or not, is always limited to matters consonant with, and germane to, the general purpose and object of the municipalities to which such prerogatives may be granted. Municipalities are but mere departments or agencies of the state, charged with the performance of duties for and on its behalf, and subject al-

ways to its control.   The state, therefore, regardless of any declarations in its constitution to the contrary, may at any time revise, amend, or even repeal any or all of the charters within it, subject, of course, to vested rights and limitations otherwise provided by our fundamental law."

I think this is a correct statement of the law as it is and as it must finally prevail.   It can in no way be avoided so long as our present system of federal and state governments obtains and so long as those underlying forces operate which always tend to lodge ultimate authority and sovereign power with him best able to exercise it and whose position makes him the final arbiter of his own claim to such power.   This is the state, not the city.   There can be no absolute autonomy in American cities no matter how limited as to subject.

We may now leave for a space these larger observations and come down to the details of the legislation of several states upon this subject, the questions which arose, and the disposition which was made of them.   These instances will serve to draw away the mind from mere theorizing and disclose some of the points of friction as well as some of the impending or threatened effects of such laws.

The experience of California in this respect is instructive. The constitution in force in that state in 1880 authorized any city containing a population of more than 100,000 to frame a charter for its own government, consistent with and subject to the constitution and laws of the state, by causing a board of fifteen freeholders to be elected who should prepare and propose a charter which must be submitted to the qualified electors of said city, and, if a majority of the latter ratify the same, submit it to the legislature for its approval or rejection as a whole, and if approved by a majority vote of the members elected to each house it should become the organic law of the city and supersede any existing charter and all amendments thereof and all special laws inconsistent with such charter.   It was decided that the purpose of this section

was to emancipate municipal governments from the authority and control formerly exercised over them by the legislature (*People v. Hoge,* 55 Cal. 612) ; that the legislature could not abridge the right given by these provisions to cities (*People ex rel. Johnson v. Bagley,* 85 Cal. 343, 24 Pac. 716) ; that a city might provide in its charter for taxation for municipal purposes (*Security Sav. Bank & T. Co. v. Hinton,* 97 Cal. 214, 32 Pac. 3). This constitution apparently proved unsatisfactory, and it was amended in 1887 by providing that such charter or amendment thereto, or any alternative article or proposition, might be presented for the choice of the voters and voted on separately; by including a consolidated city and county having a population of more than 10,000 and not more than 100,000; and in other respects. This constitution was again amended in 1902 so as to include cities containing a population of more than 3,500 and permitting fifteen per cent. of the qualified voters of the city to petition the legislative authority of the city to submit any proposed amendment or amendments to said charter to the qualified voters thereof for approval. This constitution was again amended in 1906 in this respect. All these amendments retained the feature of the first California constitution requiring the election of a board of fifteen freeholders whose duty it should be to prepare and propose a charter for the city and requiring the submission of the charter to the legislature for approval after its approval by the electors of the city. Considerable difficulty was experienced and some confusion occasioned by a constitutional amendment to sec. 6, art. XI, adopted in 1896, which read: "All charters thereof framed or adopted by authority of this constitution, *except in municipal affairs,* shall be subject to and controlled by general laws." A municipal affair was defined in *Fragley v. Phelan,* 126 Cal. 383, 58 Pac. 923, as one which related to the internal business affairs of the municipality, and that the election of the freeholders for framing of the charter was not a municipal affair. Salaries

of officers of the police and fire departments of a city are municipal affairs. *Popper v. Broderick,* 123 Cal. 456, 56 Pac. 53. The control of the almshouse of San Francisco is a municipal affair. *Weaver v. Reddy,* 135 Cal. 430, 67 Pac. 683. The functions of the board of health are municipal affairs. *People ex rel. Lawler v. Williamson,* 135 Cal. 415, 67 Pac. 504. A statute forbidding the imposition of a license tax for the purpose of revenue deals with a municipal affair. *Ex parte Helm,* 143 Cal. 553, 77 Pac. 453. The registration of voters for a municipal election is a municipal affair. *People ex rel. Martin v. Worswick,* 142 Cal. 71, 75 Pac. 663. A section in a city charter conferring upon the city power to impose license taxes for the purpose of revenue relates to a municipal affair and is paramount to a general statute forbidding such taxes. *Ex parte Braun,* 141 Cal. 204, 74 Pac. 780. In this case it appears that the city of Los Angeles, under this constitutional power, imposed a license tax upon the great majority of callings and occupations in the city, including callings or occupations in no degree subject to police regulation, sometimes basing the amount of tax upon the amount of business transacted. Braun was a wholesale liquor dealer and it imposed upon him a tax of $60 per month. These occupation taxes were upheld, Justices BEATTY and LORIGAN dissenting. Justice McFARLAND says: "The section of the constitution in question uses the loose, indefinable, wild words, 'municipal affairs,' and imposes upon the courts the almost impossible duty of saying what they mean." Chief Justice BEATTY, discussing the statement in the opinion of Justice ANGELLOTTI that "when a power is conferred upon a municipality for municipal purposes that power becomes a municipal affair," calls attention to the fact that the definition does not define or render any more definite or understandable the words of the constitution. Justice McFARLAND said: "It is difficult to realize that the people of the state, through their legislature, have no longer the power to say that a license tax—

a tax upon the right to do business, a tax upon capacity—is unjust, unequal, and oppressive, and should not be tolerated anywhere within the state; but we think such is now the law." This case shows what may take place under a constitutional grant of this kind. The school system is a matter of general concern and not a municipal affair. *Hancock v. Board of Education,* 140 Cal. 554, 74 Pac. 44. The payment of fees to jurors in criminal actions is not. *Jackson v. Baehr,* 138 Cal. 266, 71 Pac. 167. A county affair is not a municipal affair. *Popper v. Broderick, supra.* The opening of streets in a city is a municipal affair. *Byrne v. Drain,* 127 Cal. 663, 60 Pac. 433. The issuance of bonds for the repair of existing school houses and for a new school house is a municipal affair. *Law v. San Francisco,* 144 Cal. 384, 77 Pac. 1014. The collection of fines for misdemeanors punishable under state law is not a municipal affair. *Marysville v. County of Yuba,* 1 Cal. App. 628, 82 Pac. 975. The fixing of the boundaries of a territory to be annexed to a city or town is not a municipal affair. *People v. Ontario,* 148 Cal. 625, 84 Pac. 205. Nor the trial and punishment of offenses defined by the laws of the state. *Robert v. Police Court,* 148 Cal. 131, 82 Pac. 838.

These words are not as ambiguous in the California constitution as they are in ch. 476, Laws of 1911, for the reason that the California constitution, art. XI, sec. 8½, by expressly conferring upon the municipality certain designated powers, unmistakably makes these subjects municipal affairs. One is the constitutional regulation governing the manner of selection and the compensation of police court judges and their clerks and *attachés;* another the manner, times at which, and terms for which, members of the boards of education shall be elected or appointed and the number of such members; and another confers similar powers with reference to boards of police commissioners. There is also enumerated government of the municipal police force and the selection, compensation,

regulation, etc., of boards of election and clerks and their *attachés*. These, together with some other constitutional powers and the existing powers conferred by general statutes upon municipal corporations, cover the subjects described as "municipal affairs" to a considerable extent. It is said in *Security Sav. Bank & T. Co. v. Hinton,* 97 Cal. 214, 32 Pac. 3, quoting from *U. S. v. New Orleans,* 98 U. S. 381, 393 : "When such a corporation is created, the power of taxation is vested in it as an essential attribute, for all the purposes of its existence, unless its exercise be in express terms prohibited." Where the legislature controls the city, this subject is regulated by express delegation of power, supplemented by a rule of the common law that the city possesses no power not thus delegated or necessarily implied from the delegated power. Licensing horse races may be a municipal affair if the municipality has power from the state to tax and regulate that sport. *Alexander v. Elizabeth,* 56 N. J. Law, 71, 28 Atl. 51. So licensing all occupations would include the licensing of the retail sale of liquors. Full power to tax for municipal purposes or for municipal affairs, together with the power to determine what affairs were municipal affairs, would include the power to destroy property or make the license fee burdensome to the point of suppression upon some or all professions or occupations. Those Californians who sought refuge from legislative meddling with city charters in a constitutional amendment must have since experienced a good deal of constitutional intermeddling, judging from the frequent changes in the state constitution.

No doubt the words "municipal affairs," "municipal concerns," or "municipal purposes" *in a constitution* could be handled by a slow process of inclusion and exclusion until some workable theory of local government could be developed, but this promises a long period of uncertainty and a multiplication of legal questions and local quarrels and does not seem to possess much advantage over the older system. If, on the

other hand, the constitution is so framed as to prevent the legislature from interfering with the city charter (assuming that could be done), the consequence must be that instead of executive interference as in Germany, or legislative interference as heretofore in the United States, we will develop a system of judicial interference, because of the constantly recurring necessity for construction to determine what subjects are within and what without the local power.    There also must be a great variety of city charters if each charter is to be made and enacted by the electors of each municipality according to their different notions, and, unless the restriction is contained in the constitution, any provision of statute by which the so-called home rule charter is made subject to the laws of the state will not prevent local differences, appeals to the paramount legislature, nor prevent legislation by the latter changing and undoing what has been done by the locally adopted charter, for no legislature can tie the hands of succeeding legislatures.

The Missouri constitution of 1875 is perhaps the first and typical to some extent of other home rule constitutional provisions.    The city "may frame a charter for its own government, consistent with and subject to the constitution and laws of this state. . . . But such charter shall always be in harmony with and subject to the constitution and laws of the state." Sec. 16, art. IX.    When conflict as to mere municipal regulations, such as assessment of benefits and damages arising from grading streets, exists between such charter and the general laws of the state, the former supersedes the general laws on that subject (*Kansas City v. Marsh Oil Co.* 140 Mo. 458, 41 S. W. 943), but not in police matters (*State ex rel. Goodnow v. Police Comm'rs,* 184 Mo. 109, 88 S. W. 27), nor as to occupation licenses (*Kansas City v. Lorber,* 64 Mo. App. 604) ; nor to the regulation of telephone rates (*State ex rel. Garner v. Missouri & K. T. Co.* 189 Mo. 83, 88 S. W. 41), nor to create a right of civil action between citizens *inter sese*

(*Sluder v. St. Louis T. Co.* 189 Mo. 107, 88 S. W. 648). Such charter is subject to legislative control. *Ewing v. Hoblitzelle,* 85 Mo. 64; *State ex rel. Kansas City v. Field,* 99 Mo. 352, 12 S. W. 802. The charter can contain only provisions essential to a city government. Within that scope the charter so adopted has the force of an act of the state legislature. *State ex rel. Abel v. Gates,* 190 Mo. 540, 548, 89 S. W. 881. But the charter may authorize the local legislative body of the city government to compel the attendance of witnesses and the production of books and other documents relating to any sub-ject under investigation in which the interests of the city are involved, and an ordinance enacted under such charter power may authorize the city council to imprison for contempt for failure to attend and produce books of account. *In re Dunn,* 9 Mo. App. 255. It is also ruled in Missouri that if the con-stitution confers upon a city the power of eminent domain, the city by adoption of a home rule charter may regulate the exercise of such power, but it could not by such charter con-fer this power upon itself. *Kansas City v. Marsh Oil Co.* 140 Mo. 458, 41 S. W. 943. The constitution merely trans-fers to the people of the city power to legislate in purely mu-nicipal affairs. *Morrow v. Kansas City,* 186 Mo. 675, 85 S. W. 572. The power to require the production of docu-ments under such vague general issues and the power to im-prison for contempt seem extraordinary and liable to abuse, while the ruling relating to occupation licenses seems to con-flict to some extent with the California rulings on the same subject hereinbefore noticed. But on the whole it seems that the government of Missouri cities has not been much changed or benefited by this change of the state constitution.

The constitution of the state of Washington authorizes cer-tain cities to adopt their own charters consistent with and subject to the constitution and laws of the state. Art. XI, sec. 10. General laws cannot be affected by such charter (*Seymour v. Tacoma,* 6 Wash. 138, 32 Pac. 1077); nor can

the city under this power provide a tribunal and clothe it with authority to try contested election cases (*State ex rel. Fawcett v. Superior Court,* 14 Wash. 604, 45 Pac. 23) ; nor can the city under such charter fix the price of gas to be furnished its citizens or inhabitants (*Tacoma G. & E. L. Co. v. Tacoma,* 14 Wash. 288, 44 Pac. 655). The state may nevertheless pass laws relating to the assessment and collection of taxes in such city, because the state has an interest and duty in the collection of a tax levied by the city. *State ex rel. Seattle v. Carson,* 6 Wash. 250, 33 Pac. 428. But a city may not confer upon itself power to extend its boundaries, but must do so under existing general laws. *State ex rel. Snell v. Warner,* 4 Wash. 773, 31 Pac. 25.

The constitution of Minnesota as amended in 1898 authorizes cities to frame their own charters, which must be consistent with and subject to the laws of the state. Sec. 36, art. IV. "Such charter shall always be in harmony with and subject to the constitution and laws of the state of Minnesota." Id. An amendment to this part of the constitution was proposed by the Minnesota legislature of 1911. The power thus given embraces any subject appropriate to the orderly conduct of municipal affairs. *State ex rel. Barber A. P. Co. v. District Court,* 90 Minn. 457, 97 N. W. 132. Under this power the city may enact ordinances relating to the bonds of contractors and payment of laborers and materialmen, including the contents of the bonds and conditions and limitations as to their enforcement, differing in detail from the requirements of existing general laws. *Grant v. Berrisford,* 94 Minn. 45, 101 N. W. 940, 1113. The city may also regulate the manner of presenting claims against itself, auditing and allowing the same, and regulate the proceedings for reviewing the same upon appeal. It is said that these are "municipal affairs." *State ex rel. Barber A. P. Co. v. District Court,* 90 Minn. 457, 97 N. W. 132. I should regard this case as going very far if it includes the regulation of the

appeal procedure. If such cities have the power of eminent domain, the home rule charter may prescribe means for its exercise and impose duties on the courts of the state in the condemnation of property. *State ex rel. Ryan v. District Court,* 87 Minn. 146, 91 N. W. 300. Notwithstanding the home rule charter, a general law restricting the municipalities from contracting indebtedness in excess of five per cent. of the value of the taxable property of the city remains in force. *Beck v. St. Paul,* 87 Minn. 381, 92 N. W. 328. Under such charter the city council may supersede the general laws of the state relative to local assessments for street improvements (*Turner v. Snyder,* 101 Minn. 481, 112 N. W. 868), and may regulate the manner of filing claims against the city before bringing action thereon (*Peterson v. Red Wing,* 101 Minn. 62, 111 N. W. 840).

In Michigan the legislature attempted to delegate to cities by legislation resembling ch. 476, Laws of 1911, containing somewhat similar vague general words, power to amend their charters, but the supreme court of that state held the act unconstitutional as an attempt to delegate wholesale unqualified and undefined authority to the mayor and electors of the city. It was considered that the legislature must itself determine what powers the municipality shall have, and not leave it to the electors residing in the municipality to determine what legal power the latter should have. *Elliott v. Detroit,* 121 Mich. 611, 84 N. W. 820. The state constitution was then amended (art. VIII, secs. 20–25) so as to require the legislature to provide by a general law for the incorporation of cities, and by another general law for the incorporation of villages, and such general laws must limit their rate of taxation for municipal purposes and restrict their powers of borrowing money and contracting debts. "Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter, and, through its regularly constituted authority, to pass all laws and ordinances

relating to its municipal concerns, subject to the constitution and general laws of this state." Sec. 21. The next section of the Michigan constitution expressly confers upon cities certain powers relating to parks, boulevards, cemeteries, hospitals, almshouses, and all works which involve the public health or safety. The next two sections confer power to acquire, own, and operate public utilities for supplying water, light, heat, power, and transportation, with certain limitations not relevant here. The next confers the power to incur debts for the acquisition or operation of public utilities with certain restrictions and limitations. The next is negative and forbids the city to abridge the elective franchise, to loan its credit, to lay a tax for other than a public purpose, etc. It will be observed that the constitutional grant is hedged in by certain safeguards, and that while the vague words "municipal concerns" are used, still these things, or the most important of them, are specified in the constitution, and these specifications furnish something definite to which the words "municipal concerns" may be applied and from which they may be extended, "noscitur a sociis." In this way a home rule charter properly limited may be made intelligible and effective. The statement, in general terms at least, of what are municipal affairs or municipal concerns is indispensable to intelligibility wherever the limitation "subject to the constitution and laws of this state" occurs. For otherwise we move around to our starting point. Under home rule amendments to the constitution thus guarded the city of Detroit undertook to amend its charter so as to authorize it to own and operate the street railways. The attorney general attempted to restrain by *mandamus* the submission of such amendment to the electors of the city and prevailed on the ground that a revision of the charter so as to make it contain the restrictions and limitations found in secs. 3 and 5 of ch. 279, Public Acts of Michigan for 1909, should precede such submission. The court upholds the law, but the city in attempting to amend its char-

ter failed to proceed properly so as to take on with the enlarged power the legislative and constitutional limitations restricting the rate of taxation, etc.   In upholding the law the court said: "It should also be remembered constantly that 'home rule' is the fundamental purpose of the amendments and that cities can only become financially ruined by accomplishing such ruin themselves." *Att'y Gen. ex rel. Hudson v. Common Council*, 164 Mich. 369, 380, 129 N. W. 879.   To me this is a surprising sentiment, a most unusual consolation to the court.   What of the citizens whose property is swept away by such ruin accomplished by the votes of perhaps an irresponsible and non-taxpaying majority?   Home rule even with reference to local matters and universal suffrage, in industrial cities where the non-taxpaying electors are in a majority, cannot, I think, exist together, without legislative interference, or at least without judicial interference, which will be found quite as frequent and quite as objectionable to the defeated party as the old legislative interference from which he sought to escape.   So long as the paramount law charges the courts with the duty of protecting personal and property rights, and so long as there will exist under such home rule charter a tendency to encroach upon these rights, there will be judicial interference either of the state or federal judiciary or both.   So we have of interference in municipal regulations this progress: executive interference, legislative interference, judicial interference.   But there always is and must be interference of some kind unless the city is sovereign. We may indulge in vague generalities about "home rule in municipal affairs," but reflection and analysis must disclose that in so far as the city is engaged in the exercise of the taxing power or in the power of incurring obligations which must be met by taxation, so far as it may deny the equal protection of the laws, unreasonably restrain liberty, or proceed without due process, the sovereign power must always, in some form or through some department of the government, inter-

fere with and restrain the city. The numerous instances re-
ferred to tend to illustrate at what points and upon what sub-
jects the authority of the city in the exercise of its purely local
or corporate powers will conflict with personal or property
rights of others. Each citizen has, under the United States
and the state constitutions, a bill of rights for his protection.
These may be infringed as well by local regulations as by
state-wide regulation. The area in which the regulation is in
force has nothing to do with this. Neither has the fact that
the regulation relates to a city obligation or duty rather than
to a state obligation or duty. There can be no home rule
which is worth considering without the power of taxation on
the part of the city for city purposes, and there can be no taxa-
tion under our system without getting into the field of general
law and constitutional rights. Neither can there be any taxa-
tion not subject to regulation by the master hand of the state
legislature. Where "sovereignty" or even "control" is by
constitution or statute distributed between the state and the
city with reference to the subjects of regulation by each, if
the city were sovereign in all "municipal affairs" and the state
in all other affairs, still the city could not conclusively deter-
mine what affairs are "municipal," for to permit it to do so
would be to confer upon the city an overlordship which would
finally draw all power to the city. But in such case either
one must have this power and that one is the state. Under
our American theory of the origin and office of constitutions
the state may do this through its legislature and judiciary.
The former can create legal conditions, can make "affairs"
municipal or state as it deems wisest or most expedient. The
latter can apply these laws to concrete cases, and in attempt-
ing to do this can interpret the law only so far as is necessary
to apply it to the instance or cause before the court. For il-
lustration: the subjects of public health and quarantine regu-
lations, highways, education, taxation, liquor or other licenses,
hours of labor, street railway or gaslight rates, etc., within

city boundaries might by one legislature be placed under the regulatory power of the city and thus become "municipal affairs." The next legislature might think it better that the state resume its exclusive authority over some or all of these and thus make them "state affairs." It would be impossible, both on account of changing conditions and because the state could not wholly abdicate its sovereign functions over such and similar subjects, to hold that that which a legislature had once made a "municipal affair" must always thereafter remain such. So it is apparent that such "home rule" tends to invite rather than prevent interference by the state in the government of cities. Whether this interference on its own initiative or on request of the city electors be direct and plain, or whether it be accomplished by legislative shifting of subjects in and out of the class called "municipal affairs," seems to be matter of form rather than substance.

Again, considering the foregoing instances, which are part only of a greater number which have occurred, the home rule law would seem to promise neither peace nor uniformity in city government. So long as the home rule charter must be subject to legislative authority in all matters, the power of the legislature to interfere in city government is not changed, nor is there anything in the situation to lessen the disposition of the legislative body to so interfere. The dissatisfied faction in the city will come to the legislature for relief after this charter is adopted as freely as before. General laws will be enacted from time to time continually conflicting with the local charter at unexpected points and creating doubt and uncertainty, and each city will by original adoption or subsequent amendment produce a charter differing in detail from that of any other city. On the other hand, if the legislature could be constantly prohibited from any interference with the so-called home rule charter adopted by the city so far as the same related to municipal affairs, this would substitute the interference of the judicial department of government for

that of the legislative department, and every section of the charter and every ordinance must in time come before the courts in order to ascertain whether it related to a municipal affair only and so whether subject to repeal or amendment by the state legislature.  Municipal affairs, however, change from time to time.   The telephone was a short time ago a matter of local accommodation.   Now it extends beyond the boundaries of the city and even beyond those of the state. Electric light and power plants were local utilities but a short time ago; with the development of water power and the transmission of electric current to distant points their character is changed; so has that of the street railway.   2 Wilcox, Mun. Fran. § 509.   There is also a tendency in the other direction. The state may authorize a city to maintain and operate an ice plant or garbage crematory or an opera house, and immediately the maintenance and operation of these become municipal affairs.   But they were not such before.   As the powers of a city broaden in consequence of the constitution or the statute conferring additional powers and duties, so does the meaning of the words "municipal affairs."   As the legal powers of the city narrow, so does the meaning of this phrase. But there is this difference: they can never broaden to include sovereign power in an American city, although they may narrow to zero.

So far we have dealt with constitutional law, which is of course paramount to the statute, and which may itself create certain things municipal affairs or may recognize existing municipal authority under statutes as constituting what the constitution terms municipal affairs.   This, as we have seen, will present a number of difficult legal questions, but we have to do with a somewhat different situation where there is no constitutional provision and the whole question rests upon statute, as in the present case.   It is perhaps worthy of remark that the same legislature which enacted the statute in question

here, proposed by resolution No. 73 (Laws of 1911, p. 1142) an amendment to the constitution of this state as follows:

"Cities and villages shall have power and authority to amend their charters, and to frame and adopt new charters, and to enact all laws and ordinances relating to their municipal affairs, subject to the constitution and general laws of the state."

Ch. 476, Laws of 1911, as amended and corrected by sec. 95, ch. 664, Laws of 1911, provides that every city shall have authority to alter or amend its charter or adopt a new charter in the manner there specified, and for that purpose it "is hereby granted and declared to have all powers in relation to the form of its government, and to the conduct of its municipal affairs not in contravention of or withheld by the constitution or laws, operative generally throughout the state."

Sec. 2. "When a new charter shall have been adopted, or the old charter altered or amended, by any city, in the manner provided by this act, such new charter or alterations or amendments shall supersede any existing charter or statutory provision inconsistent therewith, and the same is in that event hereby repealed; two copies of such new charter or alterations or amendments, duly certified by the city clerk, shall be filed in the office of the secretary of state."

The remaining portions of the act authorize and regulate the procedure for making and amending charters and are not especially important in the instant case. It is sufficient to say that the alterations or amendments may originate with the common council or with the state board of electors and they shall be adopted by the common council and by the voters at an election or rejected by the common council and adopted by a vote of the electors, or the question of holding a charter convention for framing a new charter may in a somewhat similar manner be submitted to a vote of the electors. Delegates are chosen to frame a new charter, which becomes effective when approved by a popular vote of the electors of the city.

It will be observed that the city is in the first section granted, for the purpose of amending its charter or adopting a new one, "all powers in relation to the form of its government, and to the conduct of its municipal affairs not in contravention of or withheld by the constitution or laws, operative generally throughout the state."

In relation either to (1) the form of government, or (2) the conduct of its municipal affairs, the city has by this statute all power not withheld (a) by the constitution, or (b) by laws operative generally throughout the state, and not in contravention (a) of the constitution, or (b) of laws operative generally throughout the state. Constitution here mentioned is the constitution of Wisconsin, and laws generally operative throughout the state must mean (1) the federal constitution, treaties, and statutes of the United States according to their true meaning as settled by judicial interpretation; (2) the statutes of the state of Wisconsin according to their true meaning as settled by judicial interpretation; (3) such parts of the common law as were in force in the territory of Wisconsin at the time of the adoption of the state constitution and which were not inconsistent with that instrument (Const. art. XIV, sec. 13). This common law is evidenced by the decisions of the courts involving common-law questions. Powers not *withheld* by either of these comprehensive bodies of law is perhaps not such a sweeping exception as powers not in *contravention* thereof. Contravention means "transgression" or "violation." So that we have a statute which gives to the city power in two fields of operation, namely, (1) in relation to the form of city government, and (2) in relation to the conduct of its municipal affairs, excepting, however, from each, such powers as are in violation of existing law. The exception seems to take away about all that is given by the granting clause of the sentence. Among the rules of law operative generally throughout the state and referable to that part of the common law continued in force by our state constitution is one to the

effect that municipal corporations possess no powers not expressly granted to them by the legislature or included within those granted by reasonable implication. *Hasbrouck v. Milwaukee,* 13 Wis. 37; *Madison, W. & M. P. R. Co. v. Watertown & P. P. R. Co.* 7 Wis. 59; *Trester v. Sheboygan,* 87 Wis. 496, 58 N. W. 747, and authorities cited. We have no statute purporting to repeal or change this rule. It was said by counsel in argument that the furnishing of water by a city to its inhabitants is a municipal affair; that ice is but frozen water; hence the furnishing of ice must be a municipal affair. But things which are similar from a physical or chemical viewpoint may be dissimilar from the legal viewpoint; under a statute authorizing a city to buy coal it probably could not buy diamonds, although it is said they are chemically identical.. Neither is atmospheric gas passed through a varying aperture and articulated by varying contacts always equivalent to argument. The difference between the collection and distribution of water by means of pipes laid in the streets and the manufacture, sale, and distribution of ice is that the first is in the nature of a monopoly, while the second is a competitive business enterprise. The first does not depend so largely upon skill in management. The legislature has expressly authorized the first and has not expressly authorized the latter. If the manufacture, sale, and distribution of ice is included in the existing grants of power to cities by reasonable implication, then it was not necessary to amend the Milwaukee charter in this respect. If it is not by reasonable or necessary implication included, then such action by the municipality is in contravention of a law operative generally throughout the state, hence forbidden by the very statute under which the relator proposes to act. There is also this further difficulty inherent in the words "municipal affairs." What are municipal affairs? The first impression is that they are the legal affairs of the city. If we wish to escape from this impression we must recast the phrase so as to describe the city by refer-

ence to its physical peculiarities. But aside from artificial changes made by authority of law, such as streets, sewers, water pipes, wire conduits, and such like, the only distinctive physical feature of a city consists in an area of congested population. If we substitute for the expression "municipal affairs," "affairs of areas of congested population," we are able to get away from the legal view, but we encounter other difficulties. If a mere congested area can be given by the legislature power to provide for its own local government so far as such provisions are not in contravention of the constitution or laws generally in force throughout the state, the powers thus conferred would be few, feeble, and ineffective. The state laws relative to highways, taxes, police powers, licenses, and other like subjects would be in force, but the corporate entity, the juristic personality, would be lacking and must be conferred by some higher power or else a new state must emerge. The congested area could not confer political and legal existence upon itself. But the words "municipal affairs" assume the pre-existence of a corporate entity having affairs. Such juristic person exists only in the law and consequently its affairs are legal affairs, namely: the exercise of the powers conferred upon it by law. The manufacture, sale, and distribution of ice was not a municipal affair because the municipality had never been by statute authorized to embark in, conduct, or carry on such business. It could amend its charter relative to the conduct of its municipal affairs only, and this is not such an affair. The city could not make that a municipal affair which the state legislature had not made so. This statute purports to confer no new or additional power on the city so as to make that a municipal affair which was not so before the enactment. Scanning the statute still further, it appears to relate only to the *form* of the city government and the *conduct* of its municipal affairs. Making, selling, and delivering ice do not relate to the *form* of the city government. "Conduct" means "to carry on," "to manage," "to regulate,"

"to direct the course of," and "municipal affairs" means, as we have seen, those affairs or concerns of the city which fall within its statutory and common-law powers and duties. The establishment and operation of this municipal ice plant relates, therefore, neither to the *form* of the city government nor to the *conduct* of its municipal affairs. The city cannot confer corporate existence or power upon itself, because this would be an exercise of sovereign power. Such power comes from the state. All municipal affairs, according to the definition above given, whether made such by existing law or to be made such by future statutes, are the subjects of municipal regulation. The city may by amendment to its charter or adoption of a new charter provide for the "conduct" of such affairs and nothing more under this statute. This being the scope of the power granted, the effect given to the exercise of that power, viz. "to supersede any existing charter or statutory provision inconsistent therewith," must refer not to general rules of statutory law, but to local statutes, or to statutes of the same or similar legal nature, as special city charters. The statute could not at the same time be subject to the laws operative generally throughout the state and supersede these laws. If this statute could be construed to be an attempt to confer upon the city general legislative power not only to enact laws creating municipal corporations but also to extend its own corporate powers to new subjects so as to make that a "municipal affair" which was not so under state laws, therefore to exercise full legislative power, the act would also, I think, be invalid as an unconstitutional delegation of legislative power. Const. art. XI, sec. 3. While I would not carry criticism of this statute to the extent to which it was carried by the supreme court of California when it described the words "municipal affairs" as "loose, indefinable, wild words," I do think the expression lacks clearness and definiteness, but this is in all probability due not so much to poverty of expression as it is to the fact that the writer had no very definite knowledge

upon the subject. The statute appears to be a very fair re-flection of such mental condition. However that may be, we must derive the intention of the legislature from the words of the statute. Weighing these words with reference to the sub-ject matter concerning which they were written, I think they will admit of no other reasonable interpretation than that here suggested. If the statute in question attempted to confer upon the city or its electors power or authority to make laws conferring power upon itself or themselves not otherwise con-ferred, it would also be invalid as in conflict with the sover-eignty of the state. I think the proposed amendment to the Milwaukee charter is not within the purview of the statute in question, and if it were the act would also be unconstitutional as a delegation of legislative power to an extent not warranted even by the most liberal interpretation of the constitution.

It follows that the order of the court below should be re-versed and the cause remanded with directions to quash the writ.